USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 1 of 52

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
## HAMMOND DIVISION

INDIANA STATE CONFERENCE OF
NATIONAL ASSOCIATION FOR THE
ADVANCEMENT OF COLORED PEOPLE
(NAACP); JEROME PRINCE; DAVID
WOERPEL; PATRICIA HINTON; MELVIN
MAGEE; ANNIE STEWART; and
KIMBERLY RODRIGUEZ,

                 Plaintiffs,

    v.

CONNIE LAWSON, in her official capacity as
Secretary of State of Indiana; INDIANA
ELECTION COMMISSION; BRYCE H.
BENNETT, JR., in his official capacity as
Chair of the Indiana Election Commission;
ANTHONY LONG, in his official capacity as
Vice-Chair of the Indiana Election
Commission; SUZANNAH WILSON
OVERHOLT, in her official capacity as a
Member of the Indiana Election Commission;
ZACHARY E. KLUTZ, in his official capacity
as a Member of the Indiana Election
Commission; INDIANA ELECTION
DIVISION; J. BRADLEY KING, in his official
capacity as Co-Director of the Indiana Election
Division; and ANGELA M. NUSSMEYER, in
her official capacity as Co-Director of the
Indiana Election Division,

                 Defendants.

Civil Action No._____

## **COMPLAINT**

1.    Plaintiffs bring this action to challenge the recently enacted Indiana Senate Bill

220, codified at Indiana Code § 3-6-5.2-10 (the "Lake County Precinct Consolidation Law," the

"LCPCL," the "Law" or "SB 220"), on the grounds that it violates Section 2 of the Voting Rights

Act, 52 U.S.C. § 10301, and the First, Fourteenth, and Fifteenth Amendments to the United

States Constitution.

2.      The LCPCL is special legislation that was sponsored, supported, and enacted by the General Assembly and signed by Governor Eric J. Holcomb on May 2, 2017. The Law targets only one of Indiana's 92 counties—Lake County, which is home to a substantial portion of the state's minority population—and forces it to consolidate its "small precincts," defined by the Law to mean precincts that had fewer than 600 "active" voters as of November 1, 2016.

3.      The forced elimination of precincts in Lake County as required by the LCPCL places severe, undue burdens on one of the most fundamental rights guaranteed to citizens in our representative democracy: the right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The LCPCL was intended to and will impose the greatest burden on voters in northern Lake County—specifically in Gary, East Chicago, and Hammond, Indiana—where the majority of the county's significant minority population resides, and not coincidentally, where the highest number of voting precincts are at risk of being eliminated.

4.      Lake County has approximately 522 election precincts, of which approximately 294 are at risk of consolidation or elimination as a result of the Law. A disproportionate number of these precincts are located in northern Lake County, which includes the majority-minority cities of Gary, East Chicago, and Hammond. In Gary alone, approximately 87 out of the city's 105 precincts (83%) are at risk of consolidation or elimination. In Hammond, approximately 55 out of the city's 79 precincts (70%) are at risk of consolidation or elimination. In East Chicago, approximately 25 out of the city's 31 precincts (81%) are at risk of consolidation or elimination. By contrast, only approximately 127 out of 307 precincts (41%) are at risk of consolidation or elimination in the other 14 majority-White cities, towns, and unincorporated communities in Lake County. Further, none of the approximately 1,345 precincts located in Indiana counties other than Lake County that contain under 600 active voters are at risk of consolidation or elimination.

5.      By forcing the potential elimination and consolidation of hundreds of precincts in Lake County, the LCPCL will have the effect of consolidating or eliminating a significant

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 3 of 52

number of polling locations, which will increase the costs of voting, particularly for African-American, Hispanic, and poor voters in northern Lake County where the majority of precincts will be consolidated or eliminated. By eliminating precincts in northern Lake County in particular, the law will cause voter confusion and force voters to travel longer distances to vote, severely burdening the right to vote for precisely those voters least likely to be able to carry that burden.

6.      Because polling locations rarely change in northern Lake County, voters have become accustomed to voting at the same polling location election after election. The Law will require these voters—many of whom are elderly, disabled, or have not attained high education levels, in many cases because of the ongoing effects of discrimination that continue to severely impact their communities—to undertake the "search costs" necessary to locate their new polling location or verify that their polling location has not been changed. If their new polling place is located further from their homes than their previous polling place, then the Law is likely to impose severe burdens on voting, particularly on voters in northern Lake County, many of whom do not drive or have reliable access to a vehicle.

7.      Even though the LCPCL will forcibly eliminate or consolidate hundreds of precincts in Lake County, it neither requires election officials nor provides any funding to undertake educational efforts to inform voters of their new precinct or polling location. Thus, it is highly likely that a significant number of voters will be unaware that their precincts or polling locations have changed under the Law until they attempt to vote in 2018. These voters will go to their previous polling location, where they will either discover that there is no longer a polling location there, be turned away, or be forced to cast a provisional ballot that will not be counted because Indiana law mandates the rejection of any ballot cast by a voter in a precinct other than the one to which he or she is assigned.

8.      Those voters who arrive to vote at a polling location that no longer exists or are turned away, will be required to overcome additional burdens to vote, including finding their new polling location, finding transportation, and then taking additional time to travel to a second

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 4 of 52

polling location—which may be unfamiliar and further away—to vote. Assuming these voters are able to determine their new voting location, some will necessarily be unable to undertake additional travel to their new polling place due to the time of day they attempt to vote or their personal circumstances (including but not limited to employment, family care obligations, access to transportation, and disabilities or mobility issues). Voters unable to travel to their new polling location or who appear at a polling place to which they are no longer assigned will likely cast an out of precinct ballot. Out-of-precinct ballots are rejected in their entirety in Indiana; thus these voters will suffer the ultimate burden: total disenfranchisement.

9.    By forcing Lake County to substantially increase the number of voters per precinct, the LCPCL also significantly increases the likelihood that voters will encounter long lines at the polls, making it more burdensome for voters, especially low-income and minority voters, to vote.

10.    The LCPCL will also reduce the number of precinct committeepersons in Lake County, with the most significant reduction in northern Lake County. One of the primary responsibilities of precinct committeepersons is to vote to fill vacancies in legislative and local offices. Reducing the total number of precinct committeepersons representing minority communities in northern Lake County will directly reduce the influence of minority voters in northern Lake County in filling these vacancies.

11.    The sponsors and supporters of the legislation in the General Assembly justified the LCPCL as a cost-saving measure. But that explanation is belied by the fact that the Law applies only to Lake County and not to any of the numerous majority-White (and Republican-dominated) counties that also had significant numbers of voting precincts with fewer than 600 "active" voters as of November 1, 2016. Nor have the Law's supporters offered any credible support for their claim that it will in fact result in significant net savings for Lake County, or explained whether their unsubstantiated calculations account for additional expenditures Lake County will have to make to educate the voting public.

COMPLAINT — 4

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 5 of 52

12.     As in each of Indiana's other 91 counties, the county council in Lake County has the power and authority to determine the county's budget, including the funds that will be spent on election administration. By singling out Lake County for mandatory precinct consolidation, the Law permits the General Assembly to usurp power over Lake County's election budget from the Lake County Council. Moreover, the Lake County Council has never required or even requested that the Lake County Board of Elections and Registration ("Lake County Board" or the "Board") reduce costs by consolidating precincts. To the contrary, in March 2017, the Lake County Council adopted a resolution opposing SB 220 for a number of reasons, including that the Law singles out Lake County for precinct consolidation despite the fact that the Lake County Board found that 27 other counties in Indiana have a higher percentage of precincts that would be defined as "small" under the Law than Lake County.

13.     Not only does the LCPCL strip decision-making authority about local elections budgets and precinct consolidation from the local entities where these decisions belong (and where the decision-making authority remains for every other one of Indiana's 92 counties), but the rushed timeline imposed by the LCPCL has resulted in the decision of which precincts to consolidate being delegated to a State Commission, which necessarily lacks the local knowledge necessary to make fair and accurate judgments about which precincts may be eliminated or consolidated without unduly burdening voters.

14.     The LCPCL represents the General Assembly's second (and more extreme) attempt to force only Lake County—which is home to Indiana's second largest African-American population and its largest Hispanic population—to immediately and involuntarily consolidate its precincts far beyond what is necessary or prudent. In 2014, the Republican-controlled General Assembly enacted Indiana Code section 3-11-1.5-3.4 (2014) on party lines and against vigorous opposition by Democrats and individuals and organizations (particularly those who represent the interests of racial minorities). This law (the "2014 Lake County Precinct Consolidation Law" or the "2014 Law") would have forced Lake County, and only Lake County, to consolidate precincts with fewer than 500 "active" voters.

COMPLAINT — 5

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 6 of 52

15.     The 2014 Law was challenged in Indiana state court as impermissible special legislation and as a violation of separation of powers. Both claims were brought under the Indiana Constitution. The trial court found the measure invalid on these grounds, but in March 2016, the Indiana Supreme Court reversed the decision. Justice Rucker dissented, finding not only that the special legislation was unconstitutional because the legislature had failed to identify any distinct characteristics of Lake County that justified special legislation, but that—even though the parties had not raised the issue—the law's likely negative impact on racial minorities in Gary, Indiana was further cause for alarm. *State v. Buncich*, 51 N.E.3d 136 (Ind. 2016).

16.     By the time the Indiana Supreme Court's ruling was issued, the statutory authorization for the 2014 Law had expired, which meant that, if the General Assembly was intent on forcing precinct consolidation in Lake County, it had to enact new legislation. Rather than re-enact the same legislation with the same threshold, however, the current General Assembly supermajorities[1]—which are largely comprised of the same legislators responsible for enacting the 2014 Law—chose to arbitrarily increase the threshold criteria for precinct consolidation from 500 "active" voters to 600 "active" voters. This had the effect of substantially increasing the number of precincts at risk of consolidation relative to the 2014 Law. As a result, the harm that the current Law will have, particularly on Lake County's minority voting population, is significantly exacerbated. This decision to draw even more precincts into the Law's reach has no legitimate justification and only underscores that the General Assembly's purported explanation for the Law was pretextual or tenuous at best.

17.     Plaintiffs bring the instant lawsuit to protect the right to vote and to prevent the disenfranchisement of and unjustified burdens on voters in Lake County, Indiana—including in particular, the disparate burdens placed on Lake County's African-American, Hispanic, poor, and disabled voters—under the LCPCL.

---

[1] There are 70 Republicans and 30 Democrats in the Indiana House of Representatives, and 41 Republicans and nine Democrats in the Indiana Senate.

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 7 of 52

18.     As set forth below, the LCPCL violates Section 2 of the Voting Rights Act, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. It should therefore be immediately declared illegal and enjoined.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

20.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and in this division.

## PARTIES

21.     Plaintiff INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (the "NAACP") is a nonpartisan, nonprofit organization chartered in 1940 and currently based in Gary, Indiana. A large portion of the approximately 5,000 members of the NAACP are Indiana residents who are registered to vote in Indiana and who reside in northern Lake County, where the LCPCL will have the largest negative impact on voters. The NAACP has members who will be directly impacted and harmed by the mass forced consolidation and elimination of precincts in Lake County pursuant to the LCPCL. The NAACP's representatives spent significant time and resources opposing the Law prior to its passage and working with local officials in Lake County to propose a plan for Lake County to eliminate precincts on its own. The NAACP, through its more than 25 local branches and college chapters, is involved in significant voter registration and get-out-the-vote ("GOTV") efforts. If, under the LCPCL, the Indiana Election Division implements a new precinct establishment order that eliminates or consolidates hundreds of precincts in Lake County, the NAACP will be forced to divert time, money, and resources from its other activities and expend more time and attention educating Lake County citizens on whether their polling locations have changed, helping voters find their new polling locations, and

providing rides (which may now be longer and further in distance) to voters' new voting locations.

22.     Plaintiff JEROME PRINCE is a resident and citizen of Gary, Indiana. Prince is African-American, a longtime Indiana voter, and currently votes in precinct G5-23 in Gary, where he is also a precinct committeeperson. Prince is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. He is a former Gary City Council member and currently serves as the Gary Democratic city chairman and as the Lake County Assessor. Prince's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening his rights as a voter and the loss of his position as a precinct committeeperson. As the Gary Democratic City Chairman, Prince is actively involved in voter education and GOTV efforts. The LCPCL will make Prince's voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, the Law will cause voter confusion and will make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

23.     Plaintiff DAVID WOERPEL is a resident and citizen of Hammond, Indiana. He is a longtime Indiana voter and currently votes in precinct H5-12 in Hammond. Woerpel is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. He is a former chairman of the Hammond Democratic precinct organization, and currently serves as the Democratic City Chairman in Hammond, and as such, is actively involved in voter education and GOTV efforts. The LCPCL will make Woerpel's voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, the Law will cause voter confusion and will make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

24.     Plaintiff PATRICIA HINTON is a resident and citizen of Gary, Indiana. Hinton is African-American and currently votes in precinct G5-14 in Gary, where she is also a precinct

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 9 of 52

committeeperson. G5-14 is comprised of a majority of African-American and Hispanic voters. Hinton is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. Hinton's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening her rights as a voter and the loss of her position as a precinct committeeperson. Hinton is also actively involved in voter education and GOTV efforts and the Law will make her voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, it will cause voter confusion and make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation. The voters in Hinton's precinct, which contains a large population of elderly voters, are particularly likely to be severely burdened.

25.    Plaintiff MELVIN MAGEE is a resident and citizen of Gary, Indiana. Magee is African-American and currently votes in precinct G1-10 in Gary, where is also a precinct committeeperson. Magee is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. In his role as a precinct committeeperson, Magee is actively involved in voter education and GOTV efforts. The LCPCL will make his voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, the Law will cause voter confusion, and make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

26.    Plaintiff ANNIE STEWART is a resident and citizen of Gary, Indiana. Stewart is 67 years old, and both she and her elderly mother, who is 95 years old, currently vote in precinct G1-6 in Gary, where Stewart is a vice precinct committeeperson and works as a poll worker on Election Day. Stewart's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening Stewart's and her mother's rights as voters and the loss of Stewart's position as a vice precinct committeeperson. Stewart's polling place is currently located within walking distance of her

home, and she and her mother walk to the polls on Election Day. As African Americans, Stewart and her mother strongly prefer to vote at a polling place on Election Day because of the historical significance associated with casting a vote in person on Election Day and the historical suspicion that their votes will not be counted unless they vote in person. Stewart fears that her precinct will be consolidated or eliminated under the Law, and that she will no longer be able to walk with her elderly mother to their polling place to vote because it will be too far away. Stewart does not have reliable access to transportation, and if she and her mother cannot walk to their polling place on Election Day, they may be disenfranchised. Stewart is also concerned that the consolidation of precincts in Gary will lead to long lines at her polling place, and that her mother will not be able to physically stand in such lines to vote. In addition, in her role as a vice precinct committeeperson and poll worker, Stewart is involved in voter education and GOTV efforts. The Law will make her voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, it will cause voter confusion and make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

27. Plaintiff KIMBERLY RODRIGUEZ is a resident and citizen of East Chicago, Indiana. Rodriguez is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. She currently votes in precinct EC-20 in East Chicago, where she is also a precinct committeeperson. Rodriguez's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening her rights as a voter and the loss of her position as a precinct committeeperson. In her role as a precinct committeeperson, Rodriguez is actively involved in voter education and GOTV efforts. The LCPCL will make her voter education and GOTV efforts more difficult because the Law will cause voter confusion and make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation. Rodriguez currently votes at a polling place located a short walk from

COMPLAINT — 10

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 11 of 52

her house. Rodriguez does not have reliable access to transportation, and if she cannot walk to her polling place on Election Day, she may be disenfranchised by the Law.

28.     Defendant CONNIE LAWSON is the Secretary of State for the State of Indiana (the "Secretary") and the Chief Election Official for Indiana. Ind. Code §3-6-3.7-1. As Indiana's Chief Election Official, the Secretary is responsible for overseeing the elections process in Indiana and performing ministerial duties related to the administration of state elections. *Id.* §§ 3-6-4.2-2, 3-6-3.7-2. The Secretary is sued in her official capacity for actions taken under color of law.

29.     Defendant INDIANA STATE ELECTION COMMISSION (the "State Commission") is established by Ind. Code § 3-6-4.1-1. It is responsible for administering Indiana's election laws and adopting rules that govern the establishment of precincts under Indiana law. *Id.* § 3-6-4.1-14. With respect to the LCPCL, the State Commission is now specifically required to adopt a precinct establishment order. The State Commission has the authority to approve the precinct establishment order prior to its effective date of January 1, 2018.

30.     Defendants BRYCE H. BENNETT, JR., ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY KLUTZ are sued in their respective official capacities as Chair, Vice-Chair, and Members of the State Commission.

31.     Defendant INDIANA ELECTION DIVISION is responsible for "[c]arry[ing] out the policies, decisions, and recommendations" of the Commission. Ind. Code § 3-6-4.2-3(a)(1)(A). Along with the Secretary, the Indiana Election Division is tasked with performing ministerial duties related to the administration of elections, including maintaining descriptions and maps of all precincts in Indiana and updating such descriptions and maps after each precinct establishment order is filed with the State Commission. Ind. Code §§ 3-6-4.2-2, 3-6-4.2-12. The Indiana Election Division will be tasked with implementing any precinct establishment order adopted by the State Commission under the LCPCL.

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 12 of 52

32.     Defendants J. BRADLEY KING and ANGELA M. NUSSMEYER are sued in their official capacities as Co-Directors of the Indiana Election Division.

**FACTUAL ALLEGATIONS**

**I.     Lake County Demographics**

33.     Lake County's population presently includes nearly 500,000 people, making it Indiana's second most populous county after Marion County. It is home to Indiana's second-largest African-American population and largest Hispanic population. Approximately 25% of Lake County's population is African-American and 18% is Hispanic.

34.     Lake County's minority population is largely concentrated in the northern part of the county, which includes the county's three largest cities—Hammond, Gary, and East Chicago, which has the largest Hispanic population in the county and the state. As of the 2010 Census, 84.8% of Gary's total population was African-American and 5.1% was Hispanic. East Chicago's population was 42.9% African-American and 50.9% Hispanic. Hammond's population was 22.5% African-American and 34.1% Hispanic.

35.     Northern Lake County contains a significant elderly population. In Gary, 22.2% of the population is over 60 years of age. In Hammond, 15.5% of the population is over 60 years of age. In East Chicago, 16.5% of the population is over 60 years of age.

36.     Northern Lake County also contains a sizeable disabled population. For example, in Gary, 12.9% of people under the age 65 have a disability.

37.     Many residents of Lake County live in poverty. For example, according to the 2015 American Community Survey 5-Year Estimates, 37% of Gary residents were living in poverty in 2015. As a result, many Lake County residents do not have access to a reliable vehicle, and suffer from the fact that there is no county-wide bus service in Lake County.

38.     Lake County has approximately 522 total election precincts. Of Lake County's 522 precincts, approximately 294 precincts had fewer than 600 "active" voters as of November 1, 2016 and thus meet the primary threshold for consolidation or elimination under the LCPCL.

COMPLAINT — 12

In other words, more than half of the precincts in Lake County are potentially at risk for elimination and/or consolidation under the Law.

39.     Of the approximately 294 precincts at risk of elimination or consolidation, moreover, a full 167 are in the three majority-minority cities of East Chicago, Gary, and Hammond. In Gary alone, approximately 87 out of the city's 105 precincts (83%) are at risk of consolidation or elimination. In Hammond, approximately 55 out of the city's 79 precincts (70%) are at risk of consolidation or elimination. In East Chicago, approximately 25 out of the city's 31 precincts (81%) are at risk of consolidation or elimination.

40.     By contrast, of the approximately 307 precincts in the other 14 majority-White cities, towns, and unincorporated areas in Lake County, only approximately 127 precincts (41%) are at risk of consolidation or elimination.

## II.     The Lake County Precinct Consolidation Law

### A.     The 2014 Lake County Precinct Consolidation Law

41.     The LCPCL represents the second (and more extreme) attempt in recent years to use special legislation to force Lake County to consolidate its precincts beyond what is necessary or reasonable, to the direct and serious detriment of the voting population of Lake County, which includes a substantial segment of Indiana's minority population.

42.     The prior iteration of this law, the 2014 Lake County Precinct Consolidation Law, SB 385, which was later codified at Indiana Code § 3-11-1.5-3.4, passed on party lines and was similarly purportedly aimed at reducing Lake County's costs of election administration. It resembled the current LCPCL in virtually all respects, but with two notable exceptions.

43.     First, the current Law arbitrarily increases the threshold number of "active" voters required for precinct consolidation from the threshold set by the 2014 Law, from 500 to 600. As a result, approximately 100 additional precincts are at risk of elimination or consolidation under the current law as compared to the 2014 Law.

44.     Second, while the 2014 Law left the task of consolidating precincts to a committee comprised of Lake County officials, the current law allows this task to be performed

by the State Commission in the event that Lake County officials do not agree upon a consolidation plan under a tight time schedule. Not surprisingly, that is precisely what has happened.

45.     As originally introduced and passed in the House and Senate, the text of SB 385 did not target Lake County for mandatory precinct consolidation. However, when the bill emerged from conference, it included a House-driven amendment that effectively singled out Lake County for mandatory precinct consolidation. Republican Representative Hal Slager was an advisor to the conference and is considered to be the source of the amendment that targeted Lake County for mandatory precinct consolidation. Representative Slager is also one of the legislators who sponsored the current LCPCL.

46.     Representative Slager represents the 15th House of Representatives district, which is located in southern Lake County and includes the towns and townships of Schererville and St. John Township, whose populations are over 80% White; and Dyer, whose population is 90% White. Of the 64 precincts in Representative Slager's district, only approximately 21 (33%) are vulnerable for consolidation and/or elimination under the Law. By comparison, of the approximately 294 precincts at risk of elimination in Lake County, approximately 167 (nearly 60%) are located in the majority-minority cities of East Chicago, Gary, and Hammond in northern Lake County.

47.     The 2014 Law was challenged in litigation brought by the former Chairman of the Lake County Democratic Party and several individuals whose positions as precinct committeepersons were in danger of being eliminated as a result of the legislation. *See State v. Buncich*, 51 N.E.3d 136 (Ind. 2016).

48.     In that litigation, the plaintiffs alleged that the 2014 Lake County Precinct Consolidation Law violated the Indiana Constitution, because it was impermissible "special legislation" and because it violated the Constitution's separation of powers provision. *See id.* at 139-40.

COMPLAINT — 14

49.     The trial court issued a judgment in favor of the plaintiffs and found that the 2014 Lake County Precinct Consolidation Law was impermissible special legislation because "nearly all Indiana counties have small precincts and have an interest in consolidating precincts to realize cost savings, . . . [and] there are 'no unique circumstances that rationally justify the application of the Statute solely to Lake County and not to all of Indiana's remaining 91 counties.'" *Id.* at 140-41 (quoting trial court decision). The court further found that the Law's "impact on precinct committeepersons violates separation of powers principles." *Id.* at 141.

50.     The state filed a direct appeal to the Indiana Supreme Court, which subsequently reversed in a decision issued March 22, 2016. Applying the deferential standard of review applicable to challenges to special legislation under the Indiana Constitution, a majority of the Court ultimately found that the "abnormal number of small precincts in Lake County [under the 500 'active' voters threshold] is a defining characteristic that is sufficiently distinctive to justify the Statute," even as special legislation. *Buncich*, 51 N.E.3d at 143. The majority also found that the 2014 Law did not offend the Constitution's separation of powers clause because precinct committeepersons were not "state officers" within the ambit of the Constitution's separation of powers doctrine. *Id.* at 144.

51.     Justice Rucker wrote a dissent in which he emphasized that, although the parties had not expressly raised this issue, he had serious concerns about the impact that the 2014 Law would have on the voting strength of impacted voters, particularly those in Gary. He found that "the record reflects" that "the voting power of those cities affected by the statute's mandatory consolidation . . . will be drastically diminished" and this "disparate impact on the voting power of the citizens in Lake County—Gary in particular—cannot be ignored." *Id.* at 149 (Rucker, J., dissenting).

52.     By the time the Indiana Supreme Court ruled on the appeal, the 2014 Law's authorization had expired.

COMPLAINT — 15

**B.    The 2017 Legislative and Administrative Process**

53.     In the 2017 legislative session, the first immediately following the Indiana Supreme Court's decision in *Buncich*, Representative Slager authored legislation, HB 1147, and again sponsored legislation, SB 220, that would force Lake County—and only Lake County—to consolidate its small precincts.

54.     This time, however, HB 1147 and SB 220 both arbitrarily defined "small precincts" as any precinct with fewer than 600 "active" voters—a 20% increase over the 500 "active" voter threshold established by the 2014 Law. As a result, both SB 220 and HB 1147 threatened to impose more serious burdens on Lake County's voters than the 2014 Law, because both substantially increased the number of precincts at risk of being eliminated.

55.     HB 1147 was proposed prior to SB 220. Following the proposal of HB 1147, the Lake County Board took it upon itself to undertake its own process to consolidate precincts in an effort to demonstrate to the General Assembly that state legislation was unnecessary.

56.     On February 1, 2017, the mayor of Gary, Karen Freeman-Wilson, Lake County Board Director Michelle Fajman, Lake County Board Attorney James Wieser, and Indiana NAACP President Barbara Bolling-Williams testified before the House Elections and Apportionment Committee in opposition to HB 1147.

57.     At the hearing, the Lake County Board asked the House Elections and Apportionment Committee for more time to propose and execute a plan to eliminate precincts in Lake County on its own, and the Committee agreed. As a result, HB 1147 was tabled in the House.

58.     Following that hearing, and under the pressure of pending state-sponsored special legislation that would force the elimination of precincts in Lake County based principally on one arbitrary criterion—whether a precinct had 600 "active" voters as of November 1, 2016—the Lake County Board began a forced, but good faith effort to move forward with the consolidation of certain precincts. The Lake County Board formed a committee comprised of two Democrats and two Republicans (as required under the proposed legislation) to study the County's precincts and to make recommendations to the Board regarding potential consolidation.

COMPLAINT — 16

59. The Director of the Lake County Board described the process by stating, "In essence we were asking to put [the process] back into our laps to allow us to fix our issues at home first." She noted that in the absence of state legislation, it would be up to the committee to determine, using existing data, the number of "active" voters that should be in a precinct "instead of implementing the [rigid] 600 'active' voter threshold outlined in the law."

60. The committee held discussions and received input from key local officials, including city and town chairmen, regarding potential consolidation of precincts and its likely impact.

61. Following the February 1, 2017 hearing before the House Committee on Elections and Apportionment, the Lake County Board and other local officials who were engaged in precinct consolidation work were under the impression that they had been given time to engage in precinct consolidation on a local level. Yet, while HB 1147 was on hold, SB 220 blindsided them with its progression in the Senate.

62. On February 16, 2017, the local committee submitted a status report to the House Elections and Apportionment Committee. But just as the committee was in the process of negotiating its precinct consolidation plan, it became clear that the Senate was going to move forward with its precinct consolidation legislation—SB 220—which had been dormant in the Senate for most of January and February.

63. When the local committee became aware that SB 220 was likely to pass, it halted its voluntary consolidation process. The Lake County Board picked up the issue and voted on it, deciding to target for consolidation precincts with fewer than 500 "active" voters, a figure that the Board used solely for the purpose of negotiating a proposed precinct consolidation plan, without any acknowledgement or agreement that 500 "active" voters was the correct or necessary threshold by which to consolidate precincts in Lake County.

64. The Lake County Board arrived at the 500 "active" voter threshold by comparing the number of precincts that would be at risk of consolidation or elimination if such threshold was used with the number of precincts that would be at risk of elimination or consolidation if the

Board used the 600 "active" voter threshold. The Lake County Board also took critical, local issues into account in determining the appropriate threshold for precinct consolidation, including, in particular, the accessibility of public transportation, the history of each precinct and the local customs and divisions that have led to the location of particular precincts, and the ability of voters in particular areas to travel to vote.

65.     The Lake County Board also reviewed the differences in the number of precincts that would be at risk of elimination based on the date on which the number of "active" voters in each precinct is counted. For example, the Board determined that if the relevant threshold is fewer than 500 "active" voters as of November 1, 2016, then approximately 184 precincts would be at risk of elimination, and the Board would recommend that 91 of those precincts actually be eliminated based on local concerns and state law.

66.     If the threshold is fewer than 500 "active" voters as of February 15, 2017, a later date that was agreed upon by the Lake County Board (and better reflects Lake County's current registered-voter population), then only 171 precincts would be at risk of elimination.

67.     If, however, the Lake County Board were to have used the higher threshold of 600 "active" voters and the cutoff date of November 1, 2016, as required by the current LCPCL, then over 290 precincts would be at risk of consolidation.

68.     In other words, the stricter 600 "active" voter threshold, chosen arbitrarily by the General Assembly in 2017, puts at risk approximately 100 more precincts than if the 500 "active" voter threshold were used. *See* Testimony of Lake County Board Director, Michelle Fajman, Indiana House of Representatives Elections and Apportionment Committee Meeting at 45-49 (Mar. 15, 2017).

69.     In the end, despite the local committee's attempt to create a plan to consolidate precincts and the Lake County Board's vote to target for consolidation precincts with fewer than 500 "active" voters—which was exactly what the 2014 Law required—the General Assembly went forward with SB 220.

COMPLAINT — 18

70. There was no legitimate reason for the General Assembly to move forward with SB 220 when the Lake County Board was already considering consolidating Lake County precincts with fewer than 500 "active" voters and was finalizing its plans to do so.[2]

71. At a House Elections and Apportionment Committee hearing held on March 15, 2017, Senator Rick Niemeyer recognized that most of the precincts that would be eliminated or consolidated under the LCPCL are in urban areas in the northern part of Lake County. He made it clear that precincts in southern Lake County would be mostly protected presumably because he knew the Law would have the greatest impact on northern Lake County. Precincts in southern Lake County are predominantly home to White voters.

72. And, in fact, the majority-White districts represented by Representative Slager and Senator Niemeyer are largely not subject to consolidation and/or elimination under the Law. As previously noted, only approximately 21 of the 64 precincts in Representative Slager's district (33%) are eligible for consolidation and/or elimination. Similarly, only approximately 30 of the 136 precincts in Senator Niemeyer's district (22%) are vulnerable.

73. By comparison, of the 294 precincts at risk of elimination, 167 precincts (58%) are located in the majority-minority cities of East Chicago, Gary, or Hammond in northern Lake County. In Gary alone, 87 out of the city's 105 precincts (83%) are at risk of consolidation or elimination. In Hammond, 55 out of the city's 79 precincts (70%) are at risk of consolidation or elimination. In East Chicago, 25 out of the city's 31 precincts (81%) are at risk of consolidation or elimination.

74. On February 23, 2017, State Senator Eddie Melton, who is African-American, proposed an amendment to SB 220 that would have defined a "small" precinct as one with fewer than 500 "active" voters instead of 600 "active" voters—bringing the LCPCL in line with the

---

[2] This is not the first time that the Lake County Board has voluntarily engaged in precinct consolidation, while at the same time ensuring that such consolidations do not inordinately burden the County's voters. In 2010, the Board eliminated approximately 54 precincts on its own without state involvement. The precinct consolidation proposal voluntarily undertaken and agreed upon by the Board in early 2017 would have targeted for consolidation precincts with fewer than 500 active voters. If it had gone into effect and had not been usurped by the LCPCL, that plan likely would have resulted in the elimination of another 91 precincts. If the Board had been able to act on its own, its proposed cuts likely would have meant that approximately 145 precincts (or a quarter of all the precincts in Lake County) would have been eliminated over a seven year period.

2014 Lake County Precinct Consolidation Law. That amendment failed on a party line vote of 40 to 9.

75. SB 220 was passed in the Senate by a virtual party line vote of 38-11. It was passed in the House, also on a near party line vote, by a margin of 59-30. Not a single Democratic or African-American legislator voted in favor of the bill. Only four Republican legislators voted against it. Republican Governor Holcomb signed SB 220 into law on May 2, 2017.

76. SB 220 was enacted over vocal protests about the impact the Law will have on minority voters in particular, including those of the Lake County Board and Representatives Vernon Smith and Charlie Brown, both of whom are African-American Representatives from Gary and members of the Indiana Black Legislative Caucus.

77. In March 2017, the Lake County Council adopted a resolution in opposition to SB 220. The resolution made clear that the Lake County Council opposed SB 220 for five principal reasons: (1) SB 220 placed the decision-making of the consolidation of precincts solely in the hands of two individuals (the director and deputy director of the Lake County Board) by creating the Small Precinct Committee; (2) the legislation would result in state officials making decisions that should remain in the hands of Lake County; (3) SB 220 "would result in the disparate treatment of the voting rights of Lake County citizens when compared to citizens throughout the rest of the State of Indiana" because the legislation applied only to Lake County even though 27 counties in Indiana had a higher percentage of "small" precincts than Lake County; (4) SB 220 "would result in the disparate treatment between urban and rural citizens in Lake County, as well as between the citizens of Lake County and [the] rest of the State of Indiana;" and (5) the legislation "would decrease voter turnout by making it more onerous on voters to exercise their right to vote which is a major concern threatening the cornerstone of our democratic process."

78. Representative Brown stated that SB 220 "would . . . disproportionately affect areas of Lake County with higher minority populations," and that it was wrong for the legislation to target only Lake County.

79. Lake County Democratic Party Chairman, Jim Wieser, characterized the bill as voter suppression.

80. The Indiana Black Legislative Caucus identified the measure at the outset of the session as one of its two major pieces of legislation of concern.

81. The former chairman of the Lake County Democratic Party similarly protested that the bill would hit northern Lake County's population "very hard," and that "people who live where they can't use public transportation, don't have a vehicle or are disabled may not be able to get to a consolidated precinct."

82. Unless it is enjoined, the LCPCL will burden and potentially disenfranchise voters by requiring the forced consolidation of a substantial number of Lake County's voting precincts, including precincts disproportionately located in northern Lake County, which is home to a large segment of Indiana's minority population.

### C. The Text of the Lake County Precinct Consolidation Law

83. Under the LCPCL, a "small precinct committee" was established in Lake County effective May 1, 2017 (the "Small Precinct Committee").

84. The Law requires the Small Precinct Committee to be comprised of the director and deputy director of the Lake County Board—Democrat Michelle Fajman and Republican Patrick Gabrione. The LCPCL gives the Board the authority to appoint members to the Small Precinct Committee by unanimous vote of the entire membership of the Board. If an additional member is appointed, then that additional member must be an employee of the Board, and a second additional member must also be appointed who is both an employee of the Board and a member of a major political party in Lake County other than the political party of the first additional member. Thus, as designed, the Small Precinct Committee will always be evenly divided between Republicans and Democrats.

85. The Lake County Board is a statutorily created body ordinarily responsible for overseeing and administering all aspects of the election and registration process in Lake County. *See* Ind. Code § 3-6-5.2-6. It has express statutory duties and powers regarding the establishment

of precincts in the county, and, if not for the LCPCL, the Board would have the power and authority to consolidate precincts on its own according to its own criteria, as it has done in the past. *See, e.g.*, Ind. Code §§ 3-6-5.2-6, 3-11-1.5-2.

86.     The Lake County Board, which is currently controlled by Democrats, consists of five members, including the circuit court clerk and two members of each major political party, appointed by their county party chairs. Ind. Code § 3-6-5.2-4. The circuit court clerk is elected by voters in Lake County. *See* Ind. Const., art. 6 § 2.

87.     The current clerk of the Lake County Circuit/Superior Court is Michael A. Brown, who is the first African American to serve in that position. The other four members of the Lake County Board are Democrats Kevin C. Smith and Dennis Hawrot, and Republicans Michael Mellon and Dana Dumezich. The Lake County Board's administrative office is led by Democratic Director Michelle Fajman and Republican Deputy Director Patrick Gabrione. Director Fajman and Deputy Director Gabrione are not voting members of the Lake County Board.

88.     By requiring an even partisanship balance on the Small Precinct Committee, the Law gives the Republican member or members of the Committee veto power over any plan to eliminate precincts, effectively removing from the Democratically controlled Lake County Board the statutory duties and powers it has regarding the number and placement of precincts in the county. *See, e.g.*, Ind. Code §§ 3-6-5.2-6, 3-11-1.5-2.

89.     In so doing, the LCPCL negates the voting rights of Lake County's electorate, which exercised those rights to elect a Democrat, Michael Brown, to be the Clerk of the Lake County Circuit/Superior Court and also the tiebreaking vote on the Lake County Board, which would otherwise be equally split between Republicans and Democrats. Thus, not only does the Small Precinct Committee strip power away from the Democratically controlled Board, it also strips power away from Lake County voters, who exercised their voting power by electing Clerk Brown.

COMPLAINT — 22

90.     Under the LCPCL, the Small Precinct Committee is required to determine: (1) "[w]hich precincts within the county had fewer than [600] 'active' voters . . . as of November 1, 2016," (2) "[w]hether compliance with the precinct boundary standards set forth in IC 3-11-1.5-4 or IC 3-11-1.5-5 would prevent the combination of [any such] precinct," and (3) "[t]he potential savings in the administration of elections resulting from the combination of precincts under this section." Ind. Code § 3-6-5.2-10.

91.     The subsections cross-referenced in the LCPCL as quoted above refer to separate provisions of Indiana law that place restrictions on how precincts may be drawn. Specifically, precincts may not cross the boundaries of the state, a county, a township, a district of the U.S. House of Representatives, or an Indiana senate or house legislative district. *See* Ind. Code § 3-11-1.5-4. Further, the boundaries of a precinct must follow either "a boundary described in" Indiana Code § 3-11-1.5-4, a boundary of a city or town, a boundary of a town legislative body district, a boundary of a census block, or a boundary of a school corporation that does not follow a census block line. *Id.* § 3-11-1.5-5.

92.     The LCPCL provides that the Small Precinct Committee is required to determine whether compliance with the precinct boundary standards set forth in state law "would prevent the combination" of any precinct that has fewer than 600 "active" voters.

93.     Upon information and belief, of the approximately 294 precincts at risk of consolidation, at least approximately 150 precincts could be consolidated without violating precinct boundary requirements under state law. A disproportionate number of these precincts are located in northern Lake County, which includes the majority-minority cities of Gary, East Chicago, and Hammond.

94.     The LCPCL does not give the Small Precinct Committee the discretion *not* to consolidate or eliminate a precinct that has fewer than 600 "active" voters if doing so would not violate the state law restrictions on the types of precincts that can be consolidated. Under the Law, the Small Precinct Committee does not have the ability to take local issues into account in completing the required analysis or drafting a proposed precinct consolidation plan. For example,

issues such as the accessibility of public transportation in certain areas, the history of each precinct and the local customs and divisions that have led to the location of particular precincts, and the ability of voters in particular areas to travel to vote, are rendered irrelevant by SB 220.

95.      Under the LCPCL, an "active voter" is anyone "who is not an inactive voter under IC 3-7-38.2" as of November 1, 2016. Ind. Code §§ 3-6-5.2-10, 3-11-18.1-2. A voter is designated "inactive" under Ind. Code § 3-7-38.2 as a result of the County's voter list maintenance process. The "inactive" designation indicates that the County has reason to believe that a voter may have moved.  However, voters who are designated as "inactive" are still eligible to vote, and many voters designated as inactive have not in fact moved, and do show up to vote.[3]

96.      After the Small Precinct Committee has completed its initial analysis, it is required to "establish a proposed plan to consolidate precincts within the county that is consistent with the standards [in the Law]." *Id.* § 3-6-5.2-10(d).

97.      Although the LCPCL does not provide a date by which the Committee must establish its proposed plan, it contemplates virtually immediate action, because it requires the Lake County Board to adopt the Committee's proposed plan "[n]ot later than noon June 1, 2017" (less than 30 days after SB 220 became law), and "file the proposed order [adopting the plan] with [Indiana's] election division no later than noon August 1, 2017." *Id.* § 3-6-5.2-10(e).

98.      If the Lake County Board fails to file such an order as directed by the August 1 deadline, then the task of consolidating precincts in Lake County falls to the state. In that situation, the Law requires the four-member State Commission to "adopt a precinct establishment order for the county no later than September 1, 2017, based on the committee's proposed plan," or—"[i]f the commission does not have the committee's plan and findings

---

[3] The County may determine, based upon returned mail, the United States Postal Service Change of Address service, or some other reliable second-hand information, that the address listed in the voter's registration record may no longer be the voter's current residence address. *See* Ind. Code §§ 3-7-38.2-5, 3-7-38.2-6. The County will then send a notice to the voter asking the voter to verify her current address. *See id.* § 3-7-38.2-13. The County will designate the voter as "inactive" if the notice is returned as undeliverable and the voter does not vote in the next election, or if the voter fails to return the card within 30 days. *See id.* § 3-7-38.2-2. Inactive voters may be removed entirely from the voter rolls if they do not appear to vote for two general elections after being designated as inactive. *See id.* § 3-7-38.2-14. These safeguards help to ensure that eligible voters are not removed from the voter rolls because second-hand information erroneously indicated that the voter had moved.

available,"—"an order [that] the commission considers will . . . [r]ealize savings for the county . . . [and n]ot impose unreasonable obstacles on the ability of the voters of the county to vote at the polls." *Id.* § 3-6-5.2-10(f). "Unreasonable obstacles" is not defined by the LCPCL or the Indiana Code.

99.     If the proposed precinct establishment order is approved by the State Commission, the order will be effective as of January 1, 2018, just months before the U.S. Senate election in which U.S. Senator Joe Donnelly is up for re-election.

100.     If an objection to the proposed order is filed under Ind. Code § 3-11-1.5-18—which requires objections be filed no later than noon ten days after the publication of notice of the proposed precinct establishment order by the county executive—then the proposed order will still take effect on January 1, 2018, unless three members of the State Commission affirmatively vote to sustain the objection.

101.     The authorization for the LCPCL expires on January 1, 2020.

**D.     Application of the Lake County Precinct Consolidation Law**

102.     As noted, the timing of the enactment of the LCPCL and the deadlines contained within it gave the Small Precinct Committee less than one month to convene, propose, and agree upon a consolidation plan.

103.     On May 12, 2017, a Small Precinct Committee was convened that consisted of the two members identified by the Law—Ms. Fajman, the Democratic Director of the Board, and Mr. Gabrione, the Republican Deputy Director of the Board. Constrained by the 600 "active" voter threshold, Director Fajman proposed a plan that identified approximately 109 precincts that would be consolidated or eliminated. By contrast, Deputy Director Gabrione proposed a plan that identified approximately 154 precincts that would be consolidated or eliminated.

104.     Given the short time frame and expansive scope of the task, the Small Precinct Committee was unable to agree on a proposed consolidation plan to present to the Board by the June 1, 2017 deadline.

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/11/17 page 26 of 52

105.     Accordingly, the Lake County Board was not able to file a proposed precinct consolidation plan by the LCPCL's August 1 deadline, and thus, the task falls to the State Commission to adopt a precinct establishment order for the county no later than September 1, 2017.

106.     Thus, as was predictable given the parameters of the process set forth by the Law, the task of consolidating Lake County's precincts—a task which every other county in Indiana has the exclusive authority to undertake in light of each county's unique needs and characteristics—will now assumed by a state agency, which necessarily lacks the specific local knowledge or experience to reasonably determine which precincts may be consolidated and/or eliminated without burdening the rights of Lake County voters.

107.     On June 23, 2017, the State Commission adopted procedures and deadlines for the submission and consideration of proposed plans for the consolidation of "small precincts" in Lake County pursuant to the LCPCL.

108.     Those procedures provided that noon on July 13, 2017 was the deadline for a member of the Lake County Board, director or deputy director of the Lake County Board, or Lake County Democratic, Republican, or Libertarian party chairs to submit a proposed precinct consolidation plan to the Indiana Election Division. The deadline for submission of a plan by the Lake County Board is noon on August 1, 2017.

109.     The procedures further provided that proposed plans will be posted on the Indiana Election Division website, along with a notice concerning the opportunity for public comment, which may be submitted in written form or in person at the State Commission's August 9, 2017 meeting. Although at least two plans were submitted by July 10, they were not accessible on the Commission's website until Friday, July 28, 2017, making it impossible for the Lake County Board to evaluate those plans prior to the August 1 deadline imposed on it by the Commission, or for any meaningful public review and comment by the Commission's scheduled August 9 meeting. As of August 7, 2017, no notice regarding concerning opportunity for public comment has been posted to the Indiana Election Division website. The Indiana Election Commission

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/11/17 page 27 of 52

Public Session Notice dated August 3, 2017 does not indicate whether or when public comment will be allowed during the August 9, 2017 meeting. The meeting is scheduled to take place in the Indiana State House in Indianapolis, which is over two hours away from Lake County by automobile. On information and belief, although hearing rooms in the Indiana State House have the capability to broadcast live audio and/or video over the internet, the Indiana Election Commission does not plan to broadcast its August 9, 2017 meeting live.

110.    On July 13, 2017, the Lake County Democratic Central Committee submitted a letter to the State Commission objecting to the Law, and any precinct consolidation plans that fail to take into account "disenfranchisement as a result of lack of public transportation," "the arbitrary nature of 600 'active voters' as a benchmark for consolidation," and the fact that the law only impacts Lake County, among other factors.

111.    If the Indiana State Election Commission ultimately approves a mandatory precinct consolidation plan as contemplated by the Law, then the compelled consolidation of precincts must be completed by January 1, 2018, just months before the U.S. Senate election in which Senator Joe Donnelly is up for re-election. When Senator Donnelly was first elected in 2012, he defeated his Republican opponent Richard Mourdock narrowly—by approximately 140,000 votes. Notably, African Americans provided the margin of victory to Senator Donnelly, representing 15.6% of his total vote. Senator Donnelly picked up an 85,000 vote plurality in Lake County, which was particularly key to his victory.

III.    **The Lake County Precinct Consolidation Law Impermissibly Burdens, Abridges, and Denies the Right to Vote**

A.    **Burdens Imposed by SB 220**

112.    The elimination of precincts in Lake County will directly burden the right to vote. The burdens imposed by the LCPCL will be especially severe for African-American and Hispanic voters, particularly those in northern Lake County, where the majority of precincts will be eliminated.

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/11/17 page 28 of 52

113.     Voting is a habit and a custom, and recent research has demonstrated that changes in polling locations associated with precinct consolidations have a substantial effect on turnout because of the accompanying increased costs of voting.

114.     The costs of voting are *already* substantially higher for low-income voters who are more likely to rent and who frequently move from one residence to another, requiring updates to their registration to maintain their ability to vote.

115.     Due to the continuing effects of historical discrimination suffered by Indiana's minority population, low-income voters in Lake County are more likely to be African-American or Hispanic than White, and they are also more likely to be elderly, disabled, and/or support Democratic candidates.

116.     Changes in the voting process and the resulting burdens associated with those changes only *further* increase the costs of voting, and these increases in costs have a disproportionate impact on minorities, the working poor, the elderly, disabled voters, and voters who tend to vote Democratic.

117.     These increased costs include not only the cost of traveling to a voter's polling place, but also the "search costs" associated with obtaining information about the new polling place and locating it.

118.     For some voters whose precincts are eliminated as a result of the LCPCL, the costs associated with traveling further to vote at a polling place in their newly assigned precinct will impose severe burdens. For a subset of those voters, it will result in their total disenfranchisement.

119.     Given that Lake County lacks a meaningful, reliable public transportation system, voters who live in poverty and do not have access to a car—in many cases as a direct result of Indiana's history of discrimination—will suffer particularly severe burdens in attempting to exercise their right to vote if their precinct is eliminated and their polling place is changed. Low-income voters who typically have little flexibility in their work day and must vote during a narrow window before or after work will similarly suffer severe burdens.

120. The LCPCL will also significantly increase the costs of voting for all Lake County voters who reside in areas where precincts are consolidated or eliminated, because the elimination of precincts is virtually certain to result in longer wait times to vote at polling places in the consolidated precincts.

121. Counties in Indiana that have high numbers of voters per precinct, such as Marion County, have suffered from hours-long lines in recent elections, especially during presidential election years. By forcing Lake County to substantially increase the number of voters per precinct, the LCPCL significantly increases the likelihood that voters will encounter long lines at the polls, which will make it significantly more burdensome for voters, especially low-income and minority voters, to vote.

122. As with the other burdens discussed above, research has consistently shown that the burdens associated with longer wait times to vote have a substantially more significant impact on low-income and minority voters. In this case, where the vast majority of the precincts at risk are in fact located in low-income and largely minority neighborhoods, those impacts will only be exacerbated.

123. Voters in northern Lake County, including the large population of minority voters, will be further disproportionately burdened by the LCPCL because they traditionally vote at polling places in their precincts on Election Day and do not vote via absentee ballot. This is the result of several factors largely unique in Indiana to the minority communities that populate Lake County. In these communities, where the right to vote only followed the fierce and diligent fight of several generations, there is a profound significance that remains to this day in casting a vote in person at the polls on Election Day. And because these communities have repeatedly suffered—even after they were legally granted the right to vote—from both official and non-official acts meant to make it harder for them to exercise that right, they often have a profound and general mistrust of forms of voting other than in-person voting.

124. Changes in polling place locations as a result of consolidating precincts are also associated with higher rates of out-of-precinct voting.

COMPLAINT — 29

125.     Studies of the effects of precinct consolidation in other states have shown that the rate of out-of-precinct voting is 40% higher for voters who experience a change in polling place; turnout was lower among those voters whose polling locations changed; and out-of-precinct voting is far more common among minorities than among non-Hispanic Whites.

126.     Given that minority voters are already more likely to vote out of precinct, and African Americans and Hispanics are more likely to experience a polling place change under the LCPCL because the majority of precincts that will be eliminated are in northern Lake County where most of the county's minority population resides, Lake County's minority population is more likely to be forced to cast votes out of precinct as a result of the changes made by the Law. And given that the Law does not allocate any funds for voter outreach or education, the problem of out-of-precinct voting among Lake County voters is likely to be further exacerbated.

127.     That the LCPCL will drive up the number of voters who cast ballots out of precinct is highly significant, because Indiana generally rejects all ballots cast by a voter in a precinct other than the one to which he or she is assigned. Thus, in this way, too, the LCPCL will impose the ultimate burden on Indiana voters: total disenfranchisement.

128.     In sum, the LCPCL interacts with the ongoing effects of Indiana's and Lake County's history of discrimination against African Americans and Hispanics to disproportionately abridge, deny, and burden the right to vote of African Americans and Hispanics in Lake County.

### B.     Reduction in Number of Precinct Committeepersons

129.     Precinct committeepersons are directly elected to four-year terms by voters in Lake County. Precinct committeepersons represent the most fundamental, virtually grassroots level of government, and thus embody the principle of direct, representative democracy upon which our nation was founded. By virtue of their positions, precinct committeepersons are directly in contact with and accountable to the voters that elected them. Indeed, precinct committeepersons are often the elected officers that voters consult when they have questions about the voting process.

COMPLAINT — 30

130.    Precinct committeepersons also have the important role of filling vacancies in legislative and local offices. When voting to fill vacancies, each committeeperson is given one vote. *See Buncich*, 51 N.E.3d at 149-50 (Rucker, J., dissenting) (citing Ind. Code §§ 3-13-1-5, 3-13-1-6, 3-13-5-1, 3-13-11-3).

131.    Reducing the total number of precinct committeepersons representing minority communities in northern Lake County will directly reduce the influence of minority voters in filling vacancies.

132.    Because the majority of precincts that are at risk of consolidation are located in northern Lake County in the predominantly African-American and Hispanic cities of Gary, East Chicago, and Hammond, the LCPCL will disproportionately minimize the influence of African-American and Hispanic voters in the county.

133.    For example, the LCPCL will disproportionately reduce the number of precinct committeepersons in the heavily-minority second and third city council districts in Hammond, which will dilute the voting power of voters in those districts when there is a vacancy in an at-large city council seat. The Hammond City Council is comprised of six members who are elected by the voters in their districts and three members who are elected at-large. If one of the at-large members resigns, then the precinct committeepersons in all of the city council districts in Hammond would each be entitled to cast one vote to fill the vacancy.

134.    Because the LCPCL will have the effect of disproportionately reducing the number of precinct committeepersons in the heavily-minority city council districts in Hammond, the influence of the precinct committeepersons who represent minority communities will be minimized relative to the votes of the precinct committeepersons who represent majority-White communities.

### C.    The Lake County Precinct Consolidation Law SB 220 Does Not Further State Interests

#### 1.    The Law Targets Lake County Without a Rational Basis

135.    The General Assembly justified the LCPCL as a cost-saving measure to reduce the costs of election administration. However, Lake County is far from the only county in

Indiana with a significant number of precincts that would be considered "small" under the Law's current definition. Yet, no legislation has been proposed to consolidate "small precincts" in any county except for Lake County. Further, proponents of the bill did not substantiate their claims that it would in fact result in the substantial net savings for Lake County that they claimed.

136.    There are approximately 24 counties in Indiana other than Lake County in which at least half of the county's precincts have fewer than 600 "active" voters. They include Martin, Ohio, Union, Benton, Clinton, Pike, Vermillion, Posey, Crawford, Warren, Newton, Fayette, Switzerland, Spencer, Perry, Cass, Daviess, Rush, Parke, Fountain, Pulaski, Whitley, Jasper, and Orange Counties.

137.    With the exception of Lake County, none of the aforementioned counties has a significant minority population. Only two of these counties—Perry and Vermillion—have a majority of locally elected officials who are Democrats.

138.    Of these 24 counties, Martin and Ohio Counties have the largest percentage of precincts with fewer than 600 "active" voters, as approximately 94% and 91% of their precincts would be considered "small" under the Law, respectively.

139.    The General Assembly cannot assert a rational basis to explain why it has now twice passed legislation to target Lake County's small precincts without addressing the high numbers of small precincts in any of Indiana's other counties. If the purpose of the LCPCL is actually to reduce the costs of election administration, then it is inexplicable why the Law is not aimed at all counties in Indiana that have small precincts.

140.    The General Assembly has attempted to justify singling out Lake County in SB 220 by distorting data about Lake County's small precincts.

141.    As an example, the General Assembly has compared the number of registered voters per precinct in other counties (a number that includes both "active" and "inactive voters") to the number of "active" voters per precinct in Lake County. This results in a skewed comparison that makes it appear as if a significantly lower number of voters vote at Lake County's precincts than at precincts in other counties.

COMPLAINT — 32

142.     The most egregious example of this was Senator Niemeyer's comparison of Lake County to Marion County, in which he suggested that Marion County has approximately 1,200 "active" voters per precinct as compared to 600 "active" voters per precinct in Lake County. Testimony of Senator Niemeyer, Indiana House of Representatives Elections and Apportionment Committee Meeting at 3 (Mar. 15, 2017). This is false; Marion County has 1,200 registered voters per precinct, and only approximately 900 "active" voters per precinct.

### 2.     The Purported Rationales for the Lake County Precinct Consolidation Law Are Arbitrary and Tenuous

143.     The LCPCL burdens, abridges, and denies the right to vote of African-American and Hispanic voters who are significantly more likely than Whites in Indiana to vote Democratic. The LCPCL imposes maximum burden and disparate impact in that regard.

144.     Unsurprisingly, the General Assembly has been opaque about the impact the Law will have and it has explained its reasons for passing the LCPCL on grounds that are arbitrary and/or tenuous.

145.     First, the General Assembly has asserted that Lake County would save $100,000 per election by consolidating precincts under the LCPCL. But as discussed, the General Assembly has not addressed the fact that other counties in Indiana could also save significant amounts of money by consolidating their small precincts, nor has it substantiated claims that the Law will in fact result in the substantial net savings for Lake County that purportedly justified the Law.

146.     The General Assembly has not put forth any evidence to support its claims that the Law will result in significant cost savings for Lake County, much less its unsubstantiated contention that the Law will result in substantial savings per election to the county, or to establish that the costs of voter education efforts associated with the Law would not offset that savings. In reality, the Law may have the opposite effect, resulting in an increase in the cost of elections in Lake County, because the county may need to hire more election workers or purchase additional voting machines to accommodate the higher numbers of voters at each precinct and the accompanying long lines at the polls.

147.     Second, the General Assembly has not provided any legitimate justification or basis to explain why the definition of "small precinct" under the LCPCL includes any precinct that has fewer than 600 "active" voters instead of 500 "active" voters (as was the case in the 2014 Law) or some other number.

148.     The Director of the Lake County Board, Michelle Fajman, emphasized this point in a January 2017 letter to the Chairman of the House Elections and Apportionment Committee when she stated, "The barometer of six hundred (600) 'active' voters, as used in the statute, is as arbitrary and unsupported by statistics as was the five hundred (500) voter figure used in the initial legislation."

149.     The General Assembly cannot explain the sudden tightening of the threshold from 500 to 600 "active" voters, especially where the Lake County Board volunteered to consolidate precincts using the 500 "active" voter threshold. The only logical explanation is an impermissible one: that the General Assembly, emboldened by the Indiana Supreme Court's reversal on the state constitutional claims, seized the opportunity to further burden the voting rights of even more of northern Lake County's predominantly minority voters. But neither the Indiana Supreme Court's ruling, the Voting Rights Act, nor the federal Constitution permits such a result.

150.     Finally, the state cannot explain why it requires precincts to be consolidated based on the number of "active" voters in the precinct as of November 1, 2016, instead of using a more recent cutoff date or real time data. The November 1, 2016 cutoff date is over six months before the LCPCL was enacted and almost two years before the effective date of the Law.

151.     Using the arbitrary cutoff date of November 1, 2016 will have the effect of eliminating more precincts, including some precincts that currently have 600 or more "active" voters or which may have such number of voters by the next significant election, but had fewer than 600 "active" voters as of November 1, 2016.

COMPLAINT — 34

152.     Defining "small" precincts to include precincts that had fewer than 600 "active" voters as of November 1, 2016 is not just the wrong metric in theory; it will have the effect of increasing the number of voters who are burdened by the LCPCL in practice.

153.     For example, voters have registered to vote and updated their address for registration purposes since November 1, 2016. Many who applied to register to vote in the November 2016 election but submitted their applications after the October 11, 2016 deadline have now been added to the rolls, but may not have been added as of November 1, 2016. These voters are all considered "active" because they are on Indiana's voter registration rolls. However, because these voters were not registered to vote as of November 1, 2016, they will not be counted for purposes of determining whether a precinct has fewer than 600 "active" voters.

154.     Accordingly, several precincts that are considered "small" under the LCPCL because they had fewer than 600 "active" voters as of November 1, 2016 now have more than 600 "active" registered voters, and should not be at risk of consolidation, even pursuant to the Law's irrational standards.

## IV.     History of Discrimination Against Racial and Ethnic Minorities in Indiana and Lake County

155.     The LCPCL represents a continuation of Indiana's and Lake County's long history of discrimination against racial minorities, particularly in voting.

156.     The first African Americans to live in Indiana were slaves of French settlers who were brought to the state as early as 1746.

157.     In 1787, the U.S. Congress organized Indiana under the Northwest Ordinance which prohibited slavery, providing that "there shall be neither slavery nor involuntary servitude" in Indiana. Pro-slavery advocates circumvented that rule, however, by adopting a measure entitled "An Act concerning the Introduction of Negroes and Mulattoes into this Territory," which permitted any person owning or purchasing slaves outside of Indiana to bring their slaves with them to Indiana and bind them to service. As a result, even after the Northwest Ordinance was passed, nearly all of the African-American population in Indiana was held captive under a system of indentured servitude that differed little from outright slavery.

158.    After slavery and indentured servitude were ended, largely as a result of the 1820 Indiana Supreme Court case *State v. Lasselle*, 1 Blackf. 60 (Ind. 1820), which ordered all slaves, except those held before the 1787 Northwest Territory Ordinance, to be freed, overt discrimination against African Americans continued. Emma Lou Thornbrough, a leading historian of the history of African Americans in Indiana, has written that the White population in Indiana "manifested racial attitudes usually thought to be characteristic only of a certain class of Southern Whites. That the colored population was inherently inferior was a doctrine which the majority accepted without question, and in line with this belief racial barriers, both legal and social, were tightly drawn."

159.    As an example, following the adoption of the Indiana Constitution in 1816, African Americans seeking to settle in Indiana were required to register with county authorities and to post a $500 bond as a guarantee of good behavior.

160.    Then, in 1851, the Indiana Constitution was amended to completely prohibit African Americans from settling in Indiana.

161.    Throughout the nineteenth century, Indiana state laws further barred African Americans from voting, serving in the militia, and from testifying in court cases in which a White person was a party. African-American children were not allowed to attend public schools. There was even a movement, partially funded by the state, to rid the state of African Americans forever—by convincing them to move to Liberia.

162.    Long after the Fifteenth Amendment to the U.S. Constitution was ratified in 1870, African Americans still did not have full access to the franchise in Indiana. African Americans were frequently violently intimidated at the polls by White paramilitary groups, including a notorious group in Indiana called "The Wide Awakes," which was responsible for physically assaulting and attacking voters at the polls during the 1876 elections in Indianapolis.

163.    Indeed, Indiana has a particularly gruesome history of racially motivated violence against African Americans. In a well-known example, referred to as the "lynching of Thomas Shipp and Abram Smith," on August 7, 1930, three African-American teenagers were famously

accused of murdering a young White man and raping his girlfriend. While the teenagers were being held in jail, a mob broke into the jail, dragged the teenagers out, and lynched two of them. The third suspect narrowly escaped the lynch mob. No one was ever charged for their murders.

164.    Indiana is also known for having had the largest and most politically significant state organization in the national Ku Klux Klan movement of the 1920s. More than 25% of native-born adult White men in Indiana became members. At its peak in 1924, the Klan counted the governor of the state, Edward L. Jackson, among its members.

165.    In 1946, the Gary, Indiana School Board adopted its own unprecedented policy prohibiting racial discrimination, providing that children shall not be discriminated against "in the school district in which they live, or within the schools they attend, because of race, color, or religion."

166.    Nevertheless, segregation in schools persisted in Gary, and Indiana generally, long after that policy was adopted and well after the 1954 landmark *Brown v. Board of Education* decision.

167.    Indeed, almost a decade later, 100 African-American schoolchildren in Gary brought a lawsuit against the Gary schools, claiming that the city's schools were still systematically segregated. *See Bell v. Sch. City of Gary, Ind.*, 213 F. Supp. 819 (N.D. Ind. 1963), *aff'd*, 324 F.2d 209 (7th Cir. 1963). Specifically, the children alleged that city schools in Gary were maintained as racially segregated in violation of their constitutional rights and that they had been discriminated against because their schools suffered from inferior instruction and curriculums and overcrowded conditions as compared to the White schools. Although the court acknowledged that Gary's high schools were segregated, and that predominantly African-American schools were overcrowded and had less experienced teachers, the court found no violation of the students' constitutional rights because it concluded that the problem of school segregation in Gary stemmed from segregated housing.

168.    School segregation in Indiana continued after *Bell*. In the 1970s, African-American students and their parents sued the Evansville-Vanderburgh School District to enjoin

the district from operating its schools in a racially discriminatory manner. *Martin v. Evansville-Vanderburgh Sch. Corp. of Evansville.*, 347 F. Supp. 816, 816 (S.D. Ind. 1972). The plaintiffs alleged that the school's desegregation plan "did not go far enough to eliminate the vestiges of racial segregation, as required by the Fourteenth Amendment," in part because under the plan, "over half of the schools would remain all white," and African-American students would be concentrated in several underperforming schools. *Id.* at 817, 819. The district court enjoined the school district from implementing this plan, finding that it plainly did not satisfy the district's obligations under the Fourteenth Amendment to desegregate its schools. *Id.* at 820.

169.    One year later, in *United States v. Board of School Commissioners of Indianapolis*, 368 F. Supp. 1191, 1202-03 (S.D. Ind. 1973), *aff'd in part rev'd in part*, 503 F.2d 68 (7th Cir. 1974), a federal district court held that the State of Indiana had engaged in de jure segregation of the public schools in Indianapolis, Indiana.

170.    More recently, in the late 1980s, students and parents in Fort Wayne, Indiana sued Fort Wayne Community Schools (and a number of individuals) "alleging that the public elementary schools of Fort Wayne are racially segregated." *Parents for Quality Educ. with Integration v. Indiana*, 977 F.2d 1207, 1208 (7th Cir. 1992). The school district ultimately settled with the plaintiffs, agreeing to implement a more aggressive desegregation policy.

171.    Most recently, on May 2, 2017, Common Cause Indiana and the Indiana State Conference of the NAACP brought suit against the Marion County Elections Board for statutory and constitutional violations based on Marion County's lack of access to early voting. The lawsuit alleges that Marion County—which has only one early voting site for its more than 900,000 residents—has discriminated against African-American voters in failing to provide for additional early voting sites, because African Americans in Marion County are more likely to vote early than Whites.

172.    Prior to the November 2008 election, the Lake County Board voted, along party lines, to add early voting sites in the majority-minority cities of Gary, East Chicago, and Hammond. Soon thereafter—out of concern that additional early voting locations would lead to

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/11/17 page 39 of 52

higher minority voter turnout, and in a flagrant attempt to make it more burdensome for minority voters in Lake County to vote—the Republican members of the Lake County Board brought a lawsuit to enjoin all voting at the early voting sites in Gary, East Chicago, and Hammond. They argued that early voting sites in these three cities should not have been opened because there was no unanimous vote by the Lake County Board approving the locations. The Lake County Board argued that a unanimous vote was unnecessary because the three locations—one in each city— were in government offices (in the circuit court clerk's offices) and not at "satellite" voting sites. The case was ultimately resolved in favor of the Lake County Board, when on October 31, 2008, the Court of Appeals in Indiana affirmed the decision of the Lake County Superior Court. *See Curley v. Lake Cty. Bd. of Elections and Registration*, 896 N.E.2d 24 (Ind. Ct. App. 2008). The Court of Appeals held that it was reasonable for the trial court to conclude that the office of the circuit court clerk is not equivalent to a temporary satellite voting site, and thus unanimous approval to open the locations was unnecessary. The Court of Appeals also held that, "the public interest in exercising the right to vote unquestionably weighs heavily on the side of the Board's decision to open these early voting locations, especially when the . . . Plaintiffs have wholly failed to show that they have been harmed in any way." *Id*. at 40. While the lawsuit was ultimately unsuccessful, it serves as a prime example of the ways in which Indiana Republicans have engaged in a targeted effort to make voting more difficult for minority voters in northern Lake County.

173. Both Indiana and Lake County have a history of racially polarized voting. Richard Hatcher, who was elected in 1967 as the first African-American mayor of Gary, faced overwhelming White opposition to his candidacy. Indeed, Hatcher received only approximately 15% of the White vote. Hatcher was only elected because he won approximately 95% of the African-American vote and African-American voters turned out in record numbers to support his candidacy.

174. Voting in Indiana continues to be racially polarized. Marion and Lake Counties are both home to large minority populations and reliably vote Democratic. In 2016, both counties

voted for Hillary Clinton, Democratic Senate candidate Evan Bayh, and Democratic gubernatorial candidate John Gregg by wide margins. By contrast, Hamilton and Allen Counties, both of which have populations which are over 80% White, reliably vote Republican. In 2016, both counties voted for Donald Trump, Republican Senate candidate Todd Young, and Republican gubernatorial candidate Eric Holcomb by large margins.

175.    Voting within Lake County is also racially polarized. In the 2016 presidential election, for example, East Chicago, which is a majority-minority city in Lake County, voted overwhelmingly for Hillary Clinton. Meanwhile, in Lowell, an area of Lake County that is 91% White, Hillary Clinton received only about 30% of the vote, with the remainder going to President Trump and Gary Johnson.

176.    Indiana has elected very few African Americans to major offices. The first African American to be elected to statewide office was Pamela Carter, who became Secretary of State in 1992. Indiana has never elected an African American as governor or to the United States Senate. Only two African Americans have ever served on the Indiana Supreme Court. Justice Rucker, the most recent African-American justice to serve on the Indiana Supreme Court (and only the second African American to ever serve on the court), retired in May 2017.

177.    Indiana has never elected a Hispanic governor, attorney general, or member of Congress, nor has it ever had a Hispanic supreme court justice. Hispanics make up close to 7% of the state's population and 18% of the population in Lake County, yet there is only one Hispanic member in the Indiana House of Representatives and none in the Indiana Senate.

## V.    The Ongoing Effects of Indiana's and Lake County's History of Discrimination

178.    African Americans and Hispanics in Indiana and Lake County have suffered from, and continue to suffer from, the effects of official discrimination in a number of areas, including education, health, housing, employment, income, transportation, and criminal justice.

179.    As of December 2016, Lake County had the highest unemployment rate in the state, at 5.9%. This is largely due to the high unemployment rates in the county's three largest cities, and the only three cities in the county with significant minority populations, each of which

has substantially higher unemployment rates. Specifically, as of 2016, the unemployment rate in Gary, which was 84.8% African American as of the 2010 Census, was 8.4%. In East Chicago, which was 42.9% African American and 50.9% Hispanic as of the 2010 Census, the unemployment rate was 8.1%. By contrast, during the same period, the state of Indiana's unemployment rate was 4.0%, and Schererville, a majority-White city in Lake County, had an unemployment rate of 4.3%.

180.     According to the Indiana Business Research Center at Indiana University's Kelley School of Business, as of the 2010 U.S. Census, Whites were almost twice as likely as African Americans to own a home in Indiana.

181.     Gary, Indiana—which is located in northern Lake County and is likely to be hardest hit by the LCPCL—is extremely residentially segregated. According to one analysis of 2000 census data, the city had the highest "dissimilarity index" of all metro areas in the United States at 87.9, on a scale that ranges in value from 0, which means completely integrated, to 100, which means completely segregated.

182.     Infant mortality rates for African Americans in Indiana far exceed those for Whites. The Indiana State Department of Health observed in 2011 that African-American infants are 1.8 more times likely to die than White infants.

183.     In addition to being discriminated against in the political and educational spheres, African Americans in Indiana, particularly in company towns like Gary, have been persistent victims of environmental racism. After U.S. Steel's Gary Works was founded in Gary in 1906, Gary became known as one of the most polluted cities in the country. While the White, wealthier Gary residents could afford to escape the pollution in downtown Gary by moving to the suburbs, they left behind poor people and racial minorities to bear disproportionate residential exposures to industrial pollution in the city. In June 2016, the mayor of East Chicago, a majority-minority city, ordered the relocation of residents of a housing complex that had been built on the site of a defunct lead smelter which caused extremely high levels of lead contamination in the soil and drinking water in the area.

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/11/17 page 42 of 52

184.     The effects of environmental racism continue in Indiana, especially in Lake County, and Indiana's elected officials have not been responsive to the particularized needs of minorities. Former Governor Mike Pence did little to nothing to help residents of the housing complex in East Chicago even though city officials had apparently known about the problem for decades. And, that same year, former Governor Pence responded immediately to aid a community in Greentown, Indiana when its drinking water tested high in lead. Greentown is 97% White. By contrast, East Chicago is 42.9% African American and 50.9% Hispanic.

185.     In 2009, the Indiana Department of Transportation determined that the Cline Avenue bridge—which was an important route for Lake County residents to travel to Chicago—was unsafe. In 2013, the state demolished it. Since then, the state has failed to rebuild the bridge, and the 35,000 cars and trucks per day that previously traveled on the bridge must now travel along local streets in East Chicago, Hammond, and Gary. After years of failing to put forth a plan to reconstruct the bridge, the state has now outsourced the reconstruction of the bridge to a private company that will replace the bridge—which was previously free to traverse—with a toll bridge. Hammond Mayor Thomas McDermott Jr. recently raised the issue of the Cline Avenue bridge at a Northwestern Indiana Regional Planning Commission meeting, noting that the situation is a "travesty" that is "beating up [his] city." According to McDermott and East Chicago Mayor Anthony Copeland, the state has not directed any money to fix the local roads that are being stressed in the bridge's absence.

186.     According to the 2011-2015 American Community Survey 5 Year Estimates, in 2015, approximately 31.9% of African Americans and 29.3% of Hispanics in Indiana live below the poverty level, as compared to 12.7% of Whites.

187.     Many residents of northern Lake County live in poverty and do not have reliable access to a vehicle. Public transportation is not easily accessible in Lake County. In fact, there is no county-wide transportation available, and the public transportation options that exist within some municipalities in Lake County are woefully inadequate.

COMPLAINT — 42

188.     African-American and Hispanic students graduate from high school at significantly lower rates than their White peers. In the 2011-2012 school year, for example, the high school graduation rate for African-American students was 73% as compared to an 86% statewide average. Hispanic students graduated at a rate of 80%. White students, by contrast, had an 89% graduation rate.

189.     Political campaigns in Indiana have involved both explicit and implicit racial appeals. In the month before the November 2016 election, Kokomo, Indiana voters were intimidated and threatened by vandals who spray-painted residential front doors and gates, a car, and a trailer in the city with racist messages and threats, most of which referenced the Ku Klux Klan. The only residences targeted were those that displayed Democratic campaign signs and properties in close proximity to Democratic signs or other materials.

190.     Prior to the 2016 presidential election, an Independence Day parade in central Indiana featured a display of President Obama sitting on a toilet above the words "Lying African."

191.     The continued effects of discrimination on African Americans and Hispanics in Indiana generally, and Lake County in particular, continues to hinder minorities' ability to participate effectively in the political process. The LCPCL will only worsen those effects.

## CAUSES OF ACTION

### COUNT I
### (Violation of the Equal Protection Clause of the Fourteenth Amendment - Disparate Treatment of Voters)

192.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

193.     All laws that distinguish between groups must at least be rationally related to a legitimate state interest to survive scrutiny under the Equal Protection Clause. *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). Where fundamental rights and liberties are at issue, classifications which might invade or restrain them must be closely scrutinized and carefully confined. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966).

COMPLAINT — 43

194. Voters who reside in Lake County's "small precincts" are similarly situated to voters who reside in "small precincts" in other counties in Indiana.

195. Yet, as described, the LCPCL only requires the consolidation of precincts with fewer than 600 "active" voters in Lake County. It does not apply to any of the approximately 1,345 "small precincts" in Indiana's other 91 counties despite the fact that the Law has been primarily defended as a cost-saving measure, and there are 24 counties in the state (not including Lake County) in which at least half of the precincts have fewer than 600 "active" voters.

196. The LCPCL imposes significant burdens on the right to vote for voters in Lake County. The burdens imposed by the LCPCL are especially severe for certain populations, including African Americans, Hispanics, poor voters, and disabled voters. These burdens are not imposed upon similarly situated voters in other Indiana counties.

197. There is no rational basis, let alone compelling state interest, for requiring Lake County to consolidate its "small precincts" and impose the associated significant burdens on the right to vote upon Lake County voters while not treating other counties in Indiana the same, particularly those counties that have a significant number and percentage of small precincts.

198. By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Equal Protection Clause.

199. Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth Amendment by implementing and enforcing the LCPCL.

<u>**COUNT II**</u>
<u>**(Violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment - Undue Burden on the Right to Vote - *Anderson-Burdick*)**</u>

200. Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

201. Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must first carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens

COMPLAINT — 44

imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "It then must identify and evaluate the *precise interests* put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789 (emphasis added). The court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

202.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (citation and internal quotation marks omitted). And, "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 793.

203.    The LCPCL imposes significant, unjustified burdens on the right to vote for voters in Lake County. The burdens imposed by the LCPCL are especially severe for certain populations, including African Americans, Hispanics, poor voters, and disabled voters. The burdens of the Law far outweigh any of the Law's purported, unsubstantiated benefits. For these reasons alone, the Law should be invalidated.

204.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

205.    Unless enjoined by order of this Court, Defendants will continue to violate the First and Fourteenth Amendments by implementing and enforcing the LCPCL.

## COUNT III
### (Violation of Section 2 of the Voting Rights Act)

206.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

USDC IN/ND case 2:17-cv-00334-JVB-JEM document 1 filed 08/09/17 page 46 of 52

207.     Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

208.     A violation of Section 2 of the Voting Rights Act occurs when (1) a voting standard, practice, or procedure was enacted or maintained, at least in part, by an invidious purpose; or (2) the evidence establishes that, in the context of the "totality of the circumstance of the local electoral process," the standard, practice, or procedure has the result of denying a racial minority an equal opportunity to participate in the political process.

209.     Against a backdrop of high African-American and Hispanic turnout in Lake County during the 2012 U.S. Senate election in which Democratic Senator Donnelly was elected by a narrow margin, the Indiana General Assembly enacted the LCPCL, which will take effect just 10 months before Senator Donnelly runs for re-election in November 2018.

210.     In considering the LCPCL, the General Assembly rejected at least one amendment that could have reduced the burden that the Law will have on minority voters in Lake County.

211.     Upon information and belief, the General Assembly enacted the LCPCL with knowledge of Indiana's history of voting discrimination, the resulting continuing socioeconomic impacts borne by its African-American and Hispanic citizens, and the disproportionate impact that the Law would have on minority citizens' ability to vote.

212.     The LCPCL was passed while  local officials in Lake County were left in the dark, working under the threat of the passage of HB 1147, to execute a plan to consolidate precincts while carefully accounting for unique local circumstances, including the history of each precinct, the local customs and divisions that have led to the location of particular precincts, and the ability of voters in particular areas to travel to vote.

213.     Due to social and economic conditions caused by historical and ongoing discrimination, including poverty, high rates of unemployment, lower educational attainment,

and lack of access to transportation, minority voters will be disproportionately burdened by the LCPCL.

214.    The law targets Lake County only, home to Indiana's largest Hispanic population and second largest African-American population.

215.    Moreover, African-American and Hispanic voters disproportionately vote in their precincts on Election Day as compared to White voters, and the LCPCL's reduction of precincts in Lake County will interact with social and economic conditions caused by historical and ongoing discrimination in Lake County and Indiana generally, to result in an adverse discriminatory impact on African-American and Hispanic voters.

216.    The LCPCL will also have the effect of reducing the number of precinct committeepersons in the county. Reducing the number of these officials will directly minimize the influence of the voters in northern Lake County, and particularly in Gary, East Chicago, and Hammond, which have significant minority populations, by reducing the total number of votes that precinct committeepersons from such neighborhoods will cast in favor of filling vacancies for candidates and elected offices.

217.    By enacting the LCPCL, the Indiana legislature intended, at least in part, to deny or abridge the voting rights of minority voters in Lake County.

218.    Viewed in the totality of the circumstances, Indiana's implementation and enforcement of the LCPCL will interact with economic, historical, and ongoing social conditions in Indiana and Lake County to result in the denial or abridgement of equal opportunities for minority voters to participate in the political process, in violation of Section 2 of the Voting Rights Act.

219.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act.

220.    Unless enjoined by order of this Court, Defendants will continue to violate Section 2 of the Voting Rights Act by implementing and enforcing the LCPCL.

## COUNT IV
### (Violation of the Fourteenth and Fifteenth Amendments - Intentional Discrimination)

221.     Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

222.     Legislation intended, at least in part, to discriminate on the basis of race in the voting context violates the Fourteenth and Fifteenth Amendments. *See, e.g., City of Mobile v. Bolden*, 446 U.S. 55, 62, 66 (1980); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

223.     In certain cases, statistical disparities "warrant and require" a "conclusion  . . . irresistible, tantamount for all practical purposes to a mathematical demonstration," that a state acted with discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments. *See Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

224.     Over 60% of Indiana's African-American population resides in just two counties—Marion and Lake. Lake County is home to Indiana's second largest African-American population and its largest Hispanic population.

225.     On information and belief, by targeting Lake County—one of the very few counties in Indiana with a significant minority population—with mandatory, forced precinct consolidation, which will have the effect of severely burdening the voting rights of minority voters in Lake County, the Indiana legislature intended, at least in part, to suppress the votes of African-American and Hispanic voters in Indiana.

226.     The LCPCL singles out Lake County for forced precinct consolidation despite the fact that numerous other majority-White counties in Indiana have similar or higher percentages of "small" precincts than Lake County, as well as large numbers of "small" precincts overall. Indeed, because the Law only targets Lake County, *none* of the majority-White counties in Indiana that have significant numbers or percentages of "small" precincts will be affected.

227.     Within Lake County, the Law will have a disproportionate impact on northern Lake County. The LCPCL has the potential to eliminate or consolidate a substantially

disproportionate number of precincts in northern Lake County—specifically in Gary, East Chicago, and Hammond, Indiana—where the majority of the county's minority population resides.

228.    By engaging in the acts and omissions herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments.

229.    Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth and Fifteenth Amendments by implementing and enforcing the LCPCL.

## COUNT V
### (Violation of the Fourteenth Amendment - Fencing)

230.    The U.S. Supreme Court has specifically held that it is a violation of the Equal Protection Clause to "fence out" from the franchise a sector of the population because of the way they vote. *Carrington v. Rash*, 380 U.S. 89, 94 (1965). Similarly, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

231.    Upon information and belief, the LCPCL was intended to suppress (that is, fence out) and, unless declared illegal and enjoined, will in fact suppress the voting rights of Lake County voters, who were targeted because of their racial composition and because of the way that they, as members of largely minority communities, are expected to vote—i.e., for Democratic candidates.

232.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

233.    Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth Amendment by implementing and enforcing the LCPCL.

COMPLAINT — 49

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court:

A.      Declare that the Lake County Precinct Consolidation Law violates Section 2 of the Voting Rights Act and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution;

B.      Issue an emergency injunction enjoining Defendants, their agents, and successors in office, from enforcing or giving any effect to the Lake County Precinct Consolidation Law until the Court determines its legality;

C.      Issue a permanent injunction enjoining Defendants, their agents, and successors in office, from enforcing or giving any effect to the Lake County Precinct Consolidation Law; and

D.      Grant such other or further relief the Court deems appropriate, including but not limited to, an award of Plaintiffs' attorneys' fees and reasonable costs. *See* 42 U.S.C. § 1988.

Dated: August 9, 2017

Respectfully submitted,

By /s/ *Shana Levinson*
Shana Levinson, IN Bar No. 21350-45
Levinson & Levinson
384 W. 80th Pl.
Merrillville, IN 46410
Phone: (219) 769-1164
Fax: (219) 769-0337
Email: shanalevinson@hotmail.com
Email: levinsonandlevinson@yahoo.com

Marc Erik Elias (*pro hac vice-to be filed*)
Bruce V. Spiva (*pro hac vice-to be filed*)
Aria C. Branch (*pro hac vice-to be filed*)
Perkins Coie, LLP
700 13th St. N.W., Suite 600
Washington, D.C. 20005-3960
Phone: (202) 434-1627
Fax: (202) 654-9106

Email: MElias@perkinscoie.com
Email: BSpiva@perkinscoie.com
Email: ABranch@perkinscoie.com

Abha Khanna (*pro hac vice-to be filed*)
Perkins Coie, LLP
1201 Third Avenue, Ste. 4800
Seattle, WA 98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
Email: AKhanna@perkinscoie.com

Charles G. Curtis, Jr. (*pro hac vice-to be filed*)
Perkins Coie, LLP
1 East Main Street, Suite 201
Madison, WI 53703-5118
Phone: (608) 663-7460
Fax: (608) 663-7499
Email: CCurtis@perkinscoie.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing complaint will be served when the summons is available on the following persons by certified mail or hand delivery:

Connie Lawson
Secretary Of State of Indiana
Office of the Indiana Secretary of State
200 W. Washington St., Room 201
Indianapolis, IN 46204

Anthony Long
Vice-Chair, Indiana Election Commission
Office of the Indiana Secretary of State
200 W. Washington St., Room 201
Indianapolis, IN 46204

Bryce H. Bennett, Jr.,
Chair, Indiana Election Commission
Office of the Indiana Secretary of State
200 W. Washington St., Room 201
Indianapolis, IN 46204

J. Bradley King
Co-Director, Indiana Election Division
302 West Washington Street
Room E-204
Indianapolis, IN 46204

Suzannah Wilson Overholt
Member, Indiana Election Commission
Office of the Indiana Secretary of State
200 W. Washington St., Room 201
Indianapolis, IN 46204

Angela M. Nussmeyer
Co-Director, Indiana Election Division
302 West Washington Street
Room E-204
Indianapolis, IN 46204

Zachary E. Klutz
Member, Indiana Election Commission
Office of the Indiana Secretary of State
200 W. Washington St., Room 201
Indianapolis, IN 46204

By /s/ *Shana Levinson*
Shana Levinson, IN Bar No. 21350-45
Levinson & Levinson
384 W. 80th Pl.
Merrillville, IN 46410
Phone: (219) 769-1164
Fax: (219) 769-0337
Email: shanalevinson@hotmail.com
Email: levinsonandlevinson@yahoo.com