**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**HAMMOND DIVISION**

| | | |
|---|---|---|
| INDIANA STATE CONFERENCE OF | ) | |
| NATIONAL ASSOCIATION FOR THE | ) | |
| ADVANCEMENT OF COLORED | ) | |
| PEOPLE, et al., | ) | |
| | ) | Case No.  2:17-CV-00334-JVB-JEM |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CONNIE LAWSON, in her official capacity | ) | |
| as Secretary of State, et al. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**Defendants' Answer to Complaint**

Defendants; Connie Lawson, in her official capacity as Indiana's Secretary of State; the Indiana Election Commission; Bryce H. Bennett, Jr., in his official capacity as Chair of the Indiana Election Commission; Anthony Long, in his official capacity as Vice-Chair of the Indiana Election Commission; Suzannah Wilson Overholt, in her official capacity as a member of the Indiana Election Commission; Zachary E. Klutz, in his official capacity as a member of the Indiana Election Commission; the Indiana Election Division; J. Bradley King, in his official capacity as Co-Director of the Indiana Election Division; and Angela M. Nussmeyer, in her official capacity as Co-Director of the Indiana Election Division (collectively, the State); by counsel, file their answer to the Complaint filed in this action by Plaintiffs Indiana State Conference for the Advancement of Colored People (NAACP); Jerome Prince, David Woerpel; Patricia Hinton; Melvin Magee; Annie Stewart; and Kimberly Rodriguez (collectively, "Plaintiffs").

As an initial observation, there is nothing short or plain about this complaint, and it consequently violates Federal Rule of Civil Procedure 8(a)(2). Despite the Federal Rules of Civil Procedure employing a notice-based, rather than fact-based, pleading system

1

*Hardin v. Am. Elec. Power*, 188 F.R.D. 509, 510 (S.D. Ind.1999) (citations omitted), the plaintiffs filed a 50-page, 233-paragraph complaint with numerous irrelevant and spurious allegations. Nevertheless, the defendants respond to the complaint as follows, denying any allegation that is not specifically denied below:

1.     Plaintiffs bring this action to challenge the recently enacted Indiana Senate Bill 220, codified at Indiana Code § 3-6-5.2-10 (the "Lake County Precinct Consolidation Law," the "LCPCL," the "Law" or "SB 220"), on the grounds that it violates Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution.

**Answer:** The defendants admit the plaintiffs challenge through this lawsuit SB 220, but denies that it is unlawful. The defendants will simply refer to the challenged law as SB 220.

2.     The LCPCL is special legislation that was sponsored, supported, and enacted by the General Assembly and signed by Governor Eric J. Holcomb on May 2, 2017. The Law targets only one of Indiana's 92 counties—Lake County, which is home to a substantial portion of the state's minority population—and forces it to consolidate its "small precincts," defined by the Law to mean precincts that had fewer than 600 "active" voters as of November 1, 2016.

**Answer:** The defendants admit SB 220 was signed into law by Governor Holcomb on May 2, 2017. In terms of the other allegations, the defendants assert that SB 220 speaks for itself.

3.     The forced elimination of precincts in Lake County as required by the LCPCL places severe, undue burdens on one of the most fundamental rights guaranteed to citizens in our representative democracy: the right to vote. "No right is more precious in a free country than that of having a voice in the election of those who make the laws." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). The LCPCL was intended to and will impose the greatest burden on voters in northern Lake County—specifically in Gary, East Chicago, and

Hammond, Indiana—where the majority of the county's significant minority population resides, and not coincidentally, where the highest number of voting precincts are at risk of being eliminated.

> **Answer:** *Wesberry v. Sanders* is accurately quoted. The defendants deny the other allegations.

4.    Lake County has approximately 522 election precincts, of which approximately 294 are at risk of consolidation or elimination as a result of the Law. A disproportionate number of these precincts are located in northern Lake County, which includes the majority-minority cities of Gary, East Chicago, and Hammond. In Gary alone, approximately 87 out of the city's 105 precincts (83%) are at risk of consolidation or elimination. In Hammond, approximately 55 out of the city's 79 precincts (70%) are at risk of consolidation or elimination. In East Chicago, approximately 25 out of the city's 31 precincts (81%) are at risk of consolidation or elimination. By contrast, only approximately 127 out of 307 precincts (41%) are at risk of consolidation or elimination in the other 14 majority-White cities, towns, and unincorporated communities in Lake County. Further, none of the approximately 1,345 precincts located in Indiana counties other than Lake County that contain under 600 active voters are at risk of consolidation or elimination.

> **Answer:** The defendants deny that "none of the approximately 1,345 precincts located in Indiana counties other than Lake County that contain under 600 active voters are at risk of consolidation or elimination." But the defendants are without sufficient information to admit or deny the other specific allegations, but admit generally that Lake County has a significant number of precincts with fewer than 600 active voters.

5.    By forcing the potential elimination and consolidation of hundreds of precincts in Lake County, the LCPCL will have the effect of consolidating or eliminating a significant number of polling locations, which will increase the costs of voting, particularly for African-American, Hispanic, and poor voters in northern Lake County where the

majority of precincts will be consolidated or eliminated. By eliminating precincts in northern Lake County in particular, the law will cause voter confusion and force voters to travel longer distances to vote, severely burdening the right to vote for precisely those voters least likely to be able to carry that burden.

**Answer:** The defendants deny the allegations.

6.    Because polling locations rarely change in northern Lake County, voters have become accustomed to voting at the same polling location election after election. The Law will require these voters—many of whom are elderly, disabled, or have not attained high education levels, in many cases because of the ongoing effects of discrimination that continue to severely impact their communities—to undertake the "search costs" necessary to locate their new polling location or verify that their polling location has not been changed. If their new polling place is located further from their homes than their previous polling place, then the Law is likely to impose severe burdens on voting, particularly on voters in northern Lake County, many of whom do not drive or have reliable access to a vehicle.

**Answer:** The defendants do not have specific information to admit or deny the allegations about specific voters' voting habits, but deny the allegations.

7.    Even though the LCPCL will forcibly eliminate or consolidate hundreds of precincts in Lake County, it neither requires election officials nor provides any funding to undertake educational efforts to inform voters of their new precinct or polling location. Thus, it is highly likely that a significant number of voters will be unaware that their precincts or polling locations have changed under the Law until they attempt to vote in 2018. These voters will go to their previous polling location, where they will either discover that there is no longer a polling location there, be turned away, or be forced to cast a provisional ballot that will not be counted because Indiana law mandates the rejection of any ballot cast by a voter in a precinct other than the one to which he or she is assigned.

**Answer:** The defendants deny the allegations.

8.      Those voters who arrive to vote at a polling location that no longer exists or are turned away, will be required to overcome additional burdens to vote, including finding their new polling location, finding transportation, and then taking additional time to travel to a second polling location—which may be unfamiliar and further away—to vote. Assuming these voters are able to determine their new voting location, some will necessarily be unable to undertake additional travel to their new polling place due to the time of day they attempt to vote or their personal circumstances (including but not limited to employment, family care obligations, access to transportation, and disabilities or mobility issues). Voters unable to travel to their new polling location or who appear at a polling place to which they are no longer assigned will likely cast an out of precinct ballot. Out-of-precinct ballots are rejected in their entirety in Indiana; thus these voters will suffer the ultimate burden: total disenfranchisement.

**Answer:** The defendants deny the allegations.

9.      By forcing Lake County to substantially increase the number of voters per precinct, the LCPCL also significantly increases the likelihood that voters will encounter long lines at the polls, making it more burdensome for voters, especially low-income and minority voters, to vote.

**Answer:** The defendants deny the allegations.

10.     The LCPCL will also reduce the number of precinct committeepersons in Lake County, with the most significant reduction in northern Lake County. One of the primary responsibilities of precinct committeepersons is to vote to fill vacancies in legislative and local offices. Reducing the total number of precinct committeepersons representing minority communities in northern Lake County will directly reduce the influence of minority voters in northern Lake County in filling these vacancies.

**Answer:** The defendants deny the allegations.

11.     The sponsors and supporters of the legislation in the General Assembly justified the LCPCL as a cost-saving measure. But that explanation is belied by the fact

that the Law applies only to Lake County and not to any of the numerous majority-White (and Republican-dominated) counties that also had significant numbers of voting precincts with fewer than 600 "active" voters as of November 1, 2016. Nor have the Law's supporters offered any credible support for their claim that it will in fact result in significant net savings for Lake County, or explained whether their unsubstantiated calculations account for additional expenditures Lake County will have to make to educate the voting public.

> **Answer:** The defendants admit that consolidating precincts would likely result in cost-savings, but deny the other allegations.

12.    As in each of Indiana's other 91 counties, the county council in Lake County has the power and authority to determine the county's budget, including the funds that will be spent on election administration. By singling out Lake County for mandatory precinct consolidation, the Law permits the General Assembly to usurp power over Lake County's election budget from the Lake County Council. Moreover, the Lake County Council has never required or even requested that the Lake County Board of Elections and Registration ("Lake County Board" or the "Board") reduce costs by consolidating precincts. To the contrary, in March 2017, the Lake County Council adopted a resolution opposing SB 220 for a number of reasons, including that the Law singles out Lake County for precinct consolidation despite the fact that the Lake County Board found that 27 other counties in Indiana have a higher percentage of precincts that would be defined as "small" under the Law than Lake County.

> **Answer:** The defendants admit that county councils in Indiana are given authority, but cannot answer given the vague and sweeping nature of the assertions about that authority. The defendants deny the argumentative assertions about any "usurping" of authority. The defendants are without sufficient information to form a belief about the intentions of the Lake County Council.

13.    Not only does the LCPCL strip decision-making authority about local elections budgets and precinct consolidation from the local entities where these decisions

belong (and where the decision-making authority remains for every other one of Indiana's 92 counties), but the rushed timeline imposed by the LCPCL has resulted in the decision of which precincts to consolidate being delegated to a State Commission, which necessarily lacks the local knowledge necessary to make fair and accurate judgments about which precincts may be eliminated or consolidated without unduly burdening voters.

**Answer:** The defendants deny the allegations.

14.    The LCPCL represents the General Assembly's second (and more extreme) attempt to force only Lake County—which is home to Indiana's second largest African-American population and its largest Hispanic population—to immediately and involuntarily consolidate its precincts far beyond what is necessary or prudent. In 2014, the Republican-controlled General Assembly enacted Indiana Code section 3-11-1.5-3.4 (2014) on party lines and against vigorous opposition by Democrats and individuals and organizations (particularly those who represent the interests of racial minorities). This law (the "2014 Lake County Precinct Consolidation Law" or the "2014 Law") would have forced Lake County, and only Lake County, to consolidate precincts with fewer than 500 "active" voters.

**Answer:** The defendants deny the allegations.

15.    The 2014 Law was challenged in Indiana state court as impermissible special legislation and as a violation of separation of powers. Both claims were brought under the Indiana Constitution. The trial court found the measure invalid on these grounds, but in March 2016, the Indiana Supreme Court reversed the decision. Justice Rucker dissented, finding not only that the special legislation was unconstitutional because the legislature had failed to identify any distinct characteristics of Lake County that justified special legislation, but that—even though the parties had not raised the issue—the law's likely negative impact on racial minorities in Gary, Indiana was further cause for alarm. *State v. Buncich*, 51 N.E.3d 136 (Ind. 2016).

7

**Answer:** The defendants admit that the Indiana Supreme Court found that the 2014 law was justified given the abnormal number of small precincts in Lake County. Otherwise, the decision speaks for itself.

16.    By the time the Indiana Supreme Court's ruling was issued, the statutory authorization for the 2014 Law had expired, which meant that, if the General Assembly was intent on forcing precinct consolidation in Lake County, it had to enact new legislation. Rather than re-enact the same legislation with the same threshold, however, the current General Assembly supermajorities[1]—which are largely comprised of the same legislators responsible for enacting the 2014 Law—chose to arbitrarily increase the threshold criteria for precinct consolidation from 500 "active" voters to 600 "active" voters. This had the effect of substantially increasing the number of precincts at risk of consolidation relative to the 2014 Law. As a result, the harm that the current Law will have, particularly on Lake County's minority voting population, is significantly exacerbated. This decision to draw even more precincts into the Law's reach has no legitimate justification and only underscores that the General Assembly's purported explanation for the Law was pretextual or tenuous at best.

**Answer:** The defendants admit that the deadlines of the 2014 law had passed by the time the Indiana Supreme Court issues its decision. The defendants deny the other allegations.

17.    Plaintiffs bring the instant lawsuit to protect the right to vote and to prevent the disenfranchisement of and unjustified burdens on voters in Lake County, Indiana—including in particular, the disparate burdens placed on Lake County's African-American, Hispanic, poor, and disabled voters—under the LCPCL.

**Answer:** The defendants admit the plaintiff brought a lawsuit making certain allegations, but deny the suggestion that SB 220 is unlawful

---

[1] There are 70 Republicans and 30 Democrats in the Indiana House of Representatives, and 41 Republicans and nine Democrats in the Indiana Senate.

8

18.    As set forth below, the LCPCL violates Section 2 of the Voting Rights Act, and the First, Fourteenth, and Fifteenth Amendments to the United States Constitution. It should therefore be immediately declared illegal and enjoined.

**Answer:** The defendants deny the allegations because they call for a legal conclusion.

## JURISDICTION AND VENUE

19.    This Court has jurisdiction to hear Plaintiffs' claims pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), and 1357, and 42 U.S.C. §§ 1983 and 1988. This Court has jurisdiction to grant declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

**Answer:** The defendants deny the allegations because they call for a legal conclusion.

20.    Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this judicial district and in this division.

**Answer:** The defendants deny the allegations because they call for a legal conclusion.

## PARTIES

21.    Plaintiff INDIANA STATE CONFERENCE OF THE NATIONAL ASSOCIATION FOR THE ADVANCEMENT OF COLORED PEOPLE (the "NAACP") is a nonpartisan, nonprofit organization chartered in 1940 and currently based in Gary, Indiana. A large portion of the approximately 5,000 members of the NAACP are Indiana residents who are registered to vote in Indiana and who reside in northern Lake County, where the LCPCL will have the largest negative impact on voters. The NAACP has members who will be directly impacted and harmed by the mass forced consolidation and elimination of precincts in Lake County pursuant to the LCPCL. The NAACP's representatives spent significant time and resources opposing the Law prior to its passage and working with local officials in Lake County to propose a plan for Lake County to

eliminate precincts on its own. The NAACP, through its more than 25 local branches and college chapters, is involved in significant voter registration and get-out-the-vote ("GOTV") efforts. If, under the LCPCL, the Indiana Election Division implements a new precinct establishment order that eliminates or consolidates hundreds of precincts in Lake County, the NAACP will be forced to divert time, money, and resources from its other activities and expend more time and attention educating Lake County citizens on whether their polling locations have changed, helping voters find their new polling locations, and providing rides (which may now be longer and further in distance) to voters' new voting locations.

> **Answer:** The defendants are without sufficient information to form a belief about the specifics of NAACP operations, but deny the allegations that assume SB 220 is unlawful or harms the plaintiffs.

22.     Plaintiff JEROME PRINCE is a resident and citizen of Gary, Indiana. Prince is African-American, a longtime Indiana voter, and currently votes in precinct G5-23 in Gary, where he is also a precinct committeeperson. Prince is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. He is a former Gary City Council member and currently serves as the Gary Democratic city chairman and as the Lake County Assessor. Prince's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening his rights as a voter and the loss of his position as a precinct committeeperson. As the Gary Democratic City Chairman, Prince is actively involved in voter education and GOTV efforts. The LCPCL will make Prince's voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, the Law will cause voter confusion and will make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

**Answer:** The defendants are without sufficient information to form a belief about Mr. Prince's background, but deny the allegations that SB 220 is unlawful or harms the plaintiffs.

23.    Plaintiff DAVID WOERPEL is a resident and citizen of Hammond, Indiana. He is a longtime Indiana voter and currently votes in precinct H5-12 in Hammond. Woerpel is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. He is a former chairman of the Hammond Democratic precinct organization, and currently serves as the Democratic City Chairman in Hammond, and as such, is actively involved in voter education and GOTV efforts. The LCPCL will make Woerpel's voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, the Law will cause voter confusion and will make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

**Answer:** The defendants are without sufficient information to form a belief about Mr. Woerpel's background, but deny the allegations that SB 220 is unlawful or harms the plaintiffs.

24.    Plaintiff PATRICIA HINTON is a resident and citizen of Gary, Indiana. Hinton is African-American and currently votes in precinct G5-14 in Gary, where she is also a precinct committeeperson. G5-14 is comprised of a majority of African-American and Hispanic voters. Hinton is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. Hinton's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening her rights as a voter and the loss of her position as a precinct committeeperson. Hinton is also actively involved in voter education and GOTV efforts and the Law will make her voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, it will cause voter confusion and make it

more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation. The voters in Hinton's precinct, which contains a large population of elderly voters, are particularly likely to be severely burdened.

> **Answer:** The defendants are without sufficient information to form a belief about Ms. Hinton's background, but deny the allegations that SB 220 is unlawful or harms the plaintiffs.

25.    Plaintiff MELVIN MAGEE is a resident and citizen of Gary, Indiana. Magee is African-American and currently votes in precinct G1-10 in Gary, where is also a precinct committeeperson. Magee is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. In his role as a precinct committeeperson, Magee is actively involved in voter education and GOTV efforts. The LCPCL will make his voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, the Law will cause voter confusion, and make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

> **Answer:** The defendants are without sufficient information to form a belief about Ms. Magee's background, but deny the allegations that SB 220 is unlawful or harms the plaintiffs.

26.    Plaintiff ANNIE STEWART is a resident and citizen of Gary, Indiana. Stewart is 67 years old, and both she and her elderly mother, who is 95 years old, currently vote in precinct G1-6 in Gary, where Stewart is a vice precinct committeeperson and works as a poll worker on Election Day. Stewart's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening Stewart's and her mother's rights as voters and the loss of Stewart's position as a vice precinct committeeperson. Stewart's polling place is currently located within walking distance of her home, and she and her mother walk to the polls on Election Day.

As African Americans, Stewart and her mother strongly prefer to vote at a polling place on Election Day because of the historical significance associated with casting a vote in person on Election Day and the historical suspicion that their votes will not be counted unless they vote in person. Stewart fears that her precinct will be consolidated or eliminated under the Law, and that she will no longer be able to walk with her elderly mother to their polling place to vote because it will be too far away. Stewart does not have reliable access to transportation, and if she and her mother cannot walk to their polling place on Election Day, they may be disenfranchised. Stewart is also concerned that the consolidation of precincts in Gary will lead to long lines at her polling place, and that her mother will not be able to physically stand in such lines to vote. In addition, in her role as a vice precinct committeeperson and poll worker, Stewart is involved in voter education and GOTV efforts. The Law will make her voter education and GOTV efforts more difficult because, by eliminating polling places in which people have customarily voted, it will cause voter confusion and make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation.

> **Answer:** The defendants are without sufficient information to form a belief about Ms. Stewart's background, but deny the allegations that SB 220 is unlawful or harms the plaintiffs.

27.    Plaintiff KIMBERLY RODRIGUEZ is a resident and citizen of East Chicago, Indiana. Rodriguez is a Democrat, has voted for Democratic candidates in the past, and intends to do so in the future. She currently votes in precinct EC-20 in East Chicago, where she is also a precinct committeeperson. Rodriguez's precinct is considered "small" under the Law's definition, and is thus at risk of forced elimination or consolidation, which threatens burdening her rights as a voter and the loss of her position as a precinct committeeperson. In her role as a precinct committeeperson, Rodriguez is actively involved in voter education and GOTV efforts. The LCPCL will make her voter education and GOTV

efforts more difficult because the Law will cause voter confusion and make it more difficult to turn out voters, particularly minorities, low income voters, those with mobility issues, voters with disabilities, and those lacking access to reliable transportation. Rodriguez currently votes at a polling place located a short walk from her house. Rodriguez does not have reliable access to transportation, and if she cannot walk to her polling place on Election Day, she may be disenfranchised by the Law.

> **Answer:** The defendants are without sufficient information to form a belief about Ms. Rodriguez's background, but deny the allegations that SB 220 is unlawful or harms the plaintiffs.

28.    Defendant CONNIE LAWSON is the Secretary of State for the State of Indiana (the "Secretary") and the Chief Election Official for Indiana. Ind. Code §3-6-3.7-1. As Indiana's Chief Election Official, the Secretary is responsible for overseeing the elections process in Indiana and performing ministerial duties related to the administration of state elections. *Id.* §§ 3-6-4.2-2, 3-6-3.7-2. The Secretary is sued in her official capacity for actions taken under color of law.

> **Answer:** The defendants admit the individual defendants have been sued in their official capacities. The cited statutes that set forth the Indiana Secretary of State's duties speak for themselves.

29.    Defendant INDIANA STATE ELECTION COMMISSION (the "State Commission") is established by Ind. Code § 3-6-4.1-1. It is responsible for administering Indiana's election laws and adopting rules that govern the establishment of precincts under Indiana law. *Id.* § 3-6-4.1-14. With respect to the LCPCL, the State Commission is now specifically required to adopt a precinct establishment order. The State Commission has the authority to approve the precinct establishment order prior to its effective date of January 1, 2018.

> **Answer:** The cited statutes speak for themselves.

14

30.    Defendants BRYCE H. BENNETT, JR., ANTHONY LONG, SUZANNAH WILSON OVERHOLT, and ZACHARY KLUTZ are sued in their respective official capacities as Chair, Vice-Chair, and Members of the State Commission.

Answer: The defendants admit the individual defendants are sued in their official capacities.

31.    Defendant INDIANA ELECTION DIVISION is responsible for "[c]arry[ing] out the policies, decisions, and recommendations" of the Commission. Ind. Code § 3-6-4.2-3(a)(1)(A). Along with the Secretary, the Indiana Election Division is tasked with performing ministerial duties related to the administration of elections, including maintaining descriptions and maps of all precincts in Indiana and updating such descriptions and maps after each precinct establishment order is filed with the State Commission. Ind. Code §§ 3-6-4.2-2, 3-6-4.2-12. The Indiana Election Division will be tasked with implementing any precinct establishment order adopted by the State Commission under the LCPCL.

Answer: The cited statutes speak for themselves. The other allegations are denied because they call for a legal conclusion.

32.    Defendants J. BRADLEY KING and ANGELA M. NUSSMEYER are sued in their official capacities as Co-Directors of the Indiana Election Division.

Answer: The defendants admit the individual defendants are sued in their official capacities.

## FACTUAL ALLEGATIONS

### I.    Lake County Demographics

33.    Lake County's population presently includes nearly 500,000 people, making it Indiana's second most populous county after Marion County. It is home to Indiana's second-largest African-American population and largest Hispanic population. Approximately 25% of Lake County's population is African-American and 18% is Hispanic.

**Answer:** The defendants admit Lake County has a population of fewer than 500,000 people and is the second most populous county. The other allegations are denied because they are vague and ambiguous.

34.    Lake County's minority population is largely concentrated in the northern part of the county, which includes the county's three largest cities—Hammond, Gary, and East Chicago, which has the largest Hispanic population in the county and the state. As of the 2010 Census, 84.8% of Gary's total population was African-American and 5.1% was Hispanic. East Chicago's population was 42.9% African-American and 50.9% Hispanic. Hammond's population was 22.5% African-American and 34.1% Hispanic.

**Answer:** The defendants admit that the 2010 Census data appear to be accurately stated in terms of the African-American population, but deny that the Hispanic population is accurately stated because the Census data combine both those of Hispanic or Latino origin, not strictly Hispanic. The defendants are without sufficient information to admit or deny the other allegations.

35.    Northern Lake County contains a significant elderly population. In Gary, 22.2% of the population is over 60 years of age. In Hammond, 15.5% of the population is over 60 years of age. In East Chicago, 16.5% of the population is over 60 years of age.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations because "significant" is vague, and no source is provided for the other allegations.

36.    Northern Lake County also contains a sizeable disabled population. For example, in Gary, 12.9% of people under the age 65 have a disability.

Answer: The defendants do not have sufficient information to admit or deny the allegations because "sizeable" is vague, and no source is provided for the other allegations.

37.    Many residents of Lake County live in poverty. For example, according to the 2015 American Community Survey 5-Year Estimates, 37% of Gary residents were living

in poverty in 2015. As a result, many Lake County residents do not have access to a reliable vehicle, and suffer from the fact that there is no county-wide bus service in Lake County.

> Answer: The defendants do not have sufficient information to admit or deny the allegations because the term "many" is vague, and no source is provided for the other allegations.

38.    Lake County has approximately 522 total election precincts. Of Lake County's 522 precincts, approximately 294 precincts had fewer than 600 "active" voters as of November 1, 2016 and thus meet the primary threshold for consolidation or elimination under the LCPCL. In other words, more than half of the precincts in Lake County are potentially at risk for elimination and/or consolidation under the Law.

> **Answer:** The defendants admit Lake County has a large number of precincts with fewer than 600 active voters. SB 220 speaks for itself in terms of what this means, and the allegations are denied to the extent they call for legal conclusions.

39.    Of the approximately 294 precincts at risk of elimination or consolidation, moreover, a full 167 are in the three majority-minority cities of East Chicago, Gary, and Hammond. In Gary alone, approximately 87 out of the city's 105 precincts (83%) are at risk of consolidation or elimination. In Hammond, approximately 55 out of the city's 79 precincts (70%) are at risk of consolidation or elimination. In East Chicago, approximately 25 out of the city's 31 precincts (81%) are at risk of consolidation or elimination.

> **Answer:** The defendants admit Lake County has a large number of precincts with fewer than 600 active voters. SB 220 speaks for itself in terms of what this means, and the allegations are denied to the extent they call for legal conclusions.

40.    By contrast, of the approximately 307 precincts in the other 14 majority-White cities, towns, and unincorporated areas in Lake County, only approximately 127 precincts (41%) are at risk of consolidation or elimination.

**Answer:** The defendants admit Lake County has a large number of precincts with fewer than 600 active voters. SB 220 speaks for itself in terms of what this means, and the allegations are denied to the extent they call for legal conclusions.

## II.    The Lake County Precinct Consolidation Law

### A.    The 2014 Lake County Precinct Consolidation Law

41.    The LCPCL represents the second (and more extreme) attempt in recent years to use special legislation to force Lake County to consolidate its precincts beyond what is necessary or reasonable, to the direct and serious detriment of the voting population of Lake County, which includes a substantial segment of Indiana's minority population.

**Answer:** The defendants deny the allegations.

42.    The prior iteration of this law, the 2014 Lake County Precinct Consolidation Law, SB 385, which was later codified at Indiana Code § 3-11-1.5-3.4, passed on party lines and was similarly purportedly aimed at reducing Lake County's costs of election administration. It resembled the current LCPCL in virtually all respects, but with two notable exceptions.

**Answer:** The cited statute speaks for itself.

43.    First, the current Law arbitrarily increases the threshold number of "active" voters required for precinct consolidation from the threshold set by the 2014 Law, from 500 to 600. As a result, approximately 100 additional precincts are at risk of elimination or consolidation under the current law as compared to the 2014 Law.

**Answer:** The cited statute speaks for itself, but the defendants deny the additional speculative and vague allegations.

44.    Second, while the 2014 Law left the task of consolidating precincts to a committee comprised of Lake County officials, the current law allows this task to be performed by the State Commission in the event that Lake County officials do not agree

18

upon a consolidation plan under a tight time schedule. Not surprisingly, that is precisely what has happened.

**Answer:** The differences between the cited statutes speak for themselves, and the additional, argumentative allegations are denied.

45.    As originally introduced and passed in the House and Senate, the text of SB 385 did not target Lake County for mandatory precinct consolidation. However, when the bill emerged from conference, it included a House-driven amendment that effectively singled out Lake County for mandatory precinct consolidation. Republican Representative Hal Slager was an advisor to the conference and is considered to be the source of the amendment that targeted Lake County for mandatory precinct consolidation. Representative Slager is also one of the legislators who sponsored the current LCPCL.

**Answer:** The cited statutes speak for themselves; the additional, argumentative allegations are denied.

46.    Representative Slager represents the 15th House of Representatives district, which is located in southern Lake County and includes the towns and townships of Schererville and St. John Township, whose populations are over 80% White; and Dyer, whose population is 90% White. Of the 64 precincts in Representative Slager's district, only approximately 21 (33%) are vulnerable for consolidation and/or elimination under the Law. By comparison, of the approximately 294 precincts at risk of elimination in Lake County, approximately 167 (nearly 60%) are located in the majority-minority cities of East Chicago, Gary, and Hammond in northern Lake County.

**Answer:** The defendants admit Representative Slager represents the 15th District. The defendants are without sufficient information to admit or deny the additional allegations because cannot because the source is not cited nor is the timeframe provided.

47.    The 2014 Law was challenged in litigation brought by the former Chairman of the Lake County Democratic Party and several individuals whose positions as precinct

committeepersons were in danger of being eliminated as a result of the legislation. *See State v. Buncich*, 51 N.E.3d 136 (Ind. 2016).

> **Answer:** The defendants admit former Lake County Democratic Party and former sheriff John Buncich unsuccessfully challenged the 2014 law.

48.    In that litigation, the plaintiffs alleged that the 2014 Lake County Precinct Consolidation Law violated the Indiana Constitution, because it was impermissible "special legislation" and because it violated the Constitution's separation of powers provision. *See id.* at 139-40.

> **Answer:** The unsuccessful challenge speaks for itself.

49.    The trial court issued a judgment in favor of the plaintiffs and found that the 2014 Lake County Precinct Consolidation Law was impermissible special legislation because "nearly all Indiana counties have small precincts and have an interest in consolidating precincts to realize cost savings, . . . [and] there are 'no unique circumstances that rationally justify the application of the Statute solely to Lake County and not to all of Indiana's remaining 91 counties.'" *Id.* at 140-41 (quoting trial court decision). The court further found that the Law's "impact on precinct committeepersons violates separation of powers principles." *Id.* at 141.

> Answer: Former Lake County Circuit Judge Paras's order that was ultimately overturned by the Indiana Supreme Court speaks for itself.

50.    The state filed a direct appeal to the Indiana Supreme Court, which subsequently reversed in a decision issued March 22, 2016. Applying the deferential standard of review applicable to challenges to special legislation under the Indiana Constitution, a majority of the Court ultimately found that the "abnormal number of small precincts in Lake County [under the 500 'active' voters threshold] is a defining characteristic that is sufficiently distinctive to justify the Statute," even as special legislation. *Buncich*, 51 N.E.3d at 143. The majority also found that the 2014 Law did not offend the Constitution's separation of powers clause because precinct committeepersons

were not "state officers" within the ambit of the Constitution's separation of powers doctrine. *Id.* at 144.

**Answer:** The Indiana Supreme Court's decision speaks for itself.

51.    Justice Rucker wrote a dissent in which he emphasized that, although the parties had not expressly raised this issue, he had serious concerns about the impact that the 2014 Law would have on the voting strength of impacted voters, particularly those in Gary. He found that "the record reflects" that "the voting power of those cities affected by the statute's mandatory consolidation . . . will be drastically diminished" and this "disparate impact on the voting power of the citizens in Lake County—Gary in particular—cannot be ignored." *Id.* at 149 (Rucker, J., dissenting).

**Answer:** The Indiana Supreme Court's decision speaks for itself.

52.    By the time the Indiana Supreme Court ruled on the appeal, the 2014 Law's authorization had expired.

**Answer:** The defendants admit that the deadlines for the 2014 law had passed by the time the Indiana Supreme Court upheld the statute.

**B.    The 2017 Legislative and Administrative Process**

53.    In the 2017 legislative session, the first immediately following the Indiana Supreme Court's decision in *Buncich*, Representative Slager authored legislation, HB 1147, and again sponsored legislation, SB 220, that would force Lake County—and only Lake County—to consolidate its small precincts.

**Answer:** SB 220 speaks for itself.

54.    This time, however, HB 1147 and SB 220 both arbitrarily defined "small precincts" as any precinct with fewer than 600 "active" voters—a 20% increase over the 500 "active" voter threshold established by the 2014 Law. As a result, both SB 220 and HB 1147 threatened to impose more serious burdens on Lake County's voters than the 2014 Law, because both substantially increased the number of precincts at risk of being eliminated.

**Answer:** SB 220 and HB 1147 speak for themselves. The argumentative allegations are denied.

55.     HB 1147 was proposed prior to SB 220. Following the proposal of HB 1147, the Lake County Board took it upon itself to undertake its own process to consolidate precincts in an effort to demonstrate to the General Assembly that state legislation was unnecessary.

**Answer:** The allegations are denied.

56.     On February 1, 2017, the mayor of Gary, Karen Freeman-Wilson, Lake County Board Director Michelle Fajman, Lake County Board Attorney James Wieser, and Indiana NAACP President Barbara Bolling-Williams testified before the House Elections and Apportionment Committee in opposition to HB 1147.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

57.     At the hearing, the Lake County Board asked the House Elections and Apportionment Committee for more time to propose and execute a plan to eliminate precincts in Lake County on its own, and the Committee agreed. As a result, HB 1147 was tabled in the House.

**Answer:** The defendants are without sufficient information to admit or deny the allegations because they are vague and ambiguous.

58.     Following that hearing, and under the pressure of pending state-sponsored special legislation that would force the elimination of precincts in Lake County based principally on one arbitrary criterion—whether a precinct had 600 "active" voters as of November 1, 2016—the Lake County Board began a forced, but good faith effort to move forward with the consolidation of certain precincts. The Lake County Board formed a committee comprised of two Democrats and two Republicans (as required under the proposed legislation) to study the County's precincts and to make recommendations to the Board regarding potential consolidation.

Answer: The defendants are without sufficient information to admit or deny the allegations.

59.     The Director of the Lake County Board described the process by stating, "In essence we were asking to put [the process] back into our laps to allow us to fix our issues at home first." She noted that in the absence of state legislation, it would be up to the committee to determine, using existing data, the number of "active" voters that should be in a precinct "instead of implementing the [rigid] 600 'active' voter threshold outlined in the law."

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

60.     The committee held discussions and received input from key local officials, including city and town chairmen, regarding potential consolidation of precincts and its likely impact.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

61.     Following the February 1, 2017 hearing before the House Committee on Elections and Apportionment, the Lake County Board and other local officials who were engaged in precinct consolidation work were under the impression that they had been given time to engage in precinct consolidation on a local level. Yet, while HB 1147 was on hold, SB 220 blindsided them with its progression in the Senate.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

62.     On February 16, 2017, the local committee submitted a status report to the House Elections and Apportionment Committee. But just as the committee was in the process of negotiating its precinct consolidation plan, it became clear that the Senate was going to move forward with its precinct consolidation legislation—SB 220—which had been dormant in the Senate for most of January and February.

23

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

63.    When the local committee became aware that SB 220 was likely going to pass, it halted its voluntary consolidation process. The Lake County Board picked up the issue and voted on it, deciding to target for consolidation precincts with fewer than 500 "active" voters, a figure that the Board used solely for the purpose of negotiating a proposed precinct consolidation plan, without any acknowledgement or agreement that 500 "active" voters was the correct or necessary threshold by which to consolidate precincts in Lake County.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

64.    The Lake County Board arrived at the 500 "active" voter threshold by comparing the number of precincts that would be at risk of consolidation or elimination if such threshold was used with the number of precincts that would be at risk of elimination or consolidation if the Board used the 600 "active" voter threshold. The Lake County Board also took critical, local issues into account in determining the appropriate threshold for precinct consolidation, including, in particular, the accessibility of public transportation, the history of each precinct and the local customs and divisions that have led to the location of particular precincts, and the ability of voters in particular areas to travel to vote.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

65.    The Lake County Board also reviewed the differences in the number of precincts that would be at risk of elimination based on the date on which the number of "active" voters in each precinct is counted. For example, the Board determined that if the relevant threshold is fewer than 500 "active" voters as of November 1, 2016, then approximately 184 precincts would be at risk of elimination, and the Board would

recommend that 91 of those precincts actually be eliminated based on local concerns and state law.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

66.    If the threshold is fewer than 500 "active" voters as of February 15, 2017, a later date that was agreed upon by the Lake County Board (and better reflects Lake County's current registered-voter population), then only 171 precincts would be at risk of elimination.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

67.    If, however, the Lake County Board were to have used the higher threshold of 600 "active" voters and the cutoff date of November 1, 2016, as required by the current LCPCL, then over 290 precincts would be at risk of consolidation.

**Answer:** The defendants deny the allegations because they are speculative.

68.    In other words, the stricter 600 "active" voter threshold, chosen arbitrarily by the General Assembly in 2017, puts at risk approximately 100 more precincts than if the 500 "active" voter threshold were used. *See* Testimony of Lake County Board Director, Michelle Fajman, Indiana House of Representatives Elections and Apportionment Committee Meeting at 45-49 (Mar. 15, 2017).

**Answer:** The defendants deny the allegations.

69.    In the end, despite the local committee's attempt to create a plan to consolidate precincts and the Lake County Board's vote to target for consolidation precincts with fewer than 500 "active" voters—which was exactly what the 2014 Law required—the General Assembly went forward with SB 220.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

70.    There was no legitimate reason for the General Assembly to move forward with SB 220 when the Lake County Board was already considering consolidating Lake County precincts with fewer than 500 "active" voters and was finalizing its plans to do so.[2]

**Answer:** The defendants deny the allegations.

71.    At a House Elections and Apportionment Committee hearing held on March 15, 2017, Senator Rick Niemeyer recognized that most of the precincts that would be eliminated or consolidated under the LCPCL are in urban areas in the northern part of Lake County. He made it clear that precincts in southern Lake County would be mostly protected presumably because he knew the Law would have the greatest impact on northern Lake County. Precincts in southern Lake County are predominantly home to White voters.

**Answer:** The defendants are without sufficient information to admit or deny allegations related to Senator Niemeyer. They deny the other allegations because they are vague and ambiguous.

72.    And, in fact, the majority-White districts represented by Representative Slager and Senator Niemeyer are largely not subject to consolidation and/or elimination under the Law. As previously noted, only approximately 21 of the 64 precincts in Representative Slager's district (33%) are eligible for consolidation and/or elimination. Similarly, only approximately 30 of the 136 precincts in Senator Niemeyer's district (22%) are vulnerable.

**Answer:** The allegations are denied.

---

[2] This is not the first time that the Lake County Board has voluntarily engaged in precinct consolidation, while at the same time ensuring that such consolidations do not inordinately burden the County's voters. In 2010, the Board eliminated approximately 54 precincts on its own without state involvement. The precinct consolidation proposal voluntarily undertaken and agreed upon by the Board in early 2017 would have targeted for consolidation precincts with fewer than 500 active voters. If it had gone into effect and had not been usurped by the LCPCL, that plan likely would have resulted in the elimination of another 91 precincts. If the Board had been able to act on its own, its proposed cuts likely would have meant that approximately 145 precincts (or a quarter of all the precincts in Lake County) would have been eliminated over a seven year period.

73.    By comparison, of the 294 precincts at risk of elimination, 167 precincts (58%) are located in the majority-minority cities of East Chicago, Gary, or Hammond in northern Lake County. In Gary alone, 87 out of the city's 105 precincts (83%) are at risk of consolidation or elimination. In Hammond, 55 out of the city's 79 precincts (70%) are at risk of consolidation or elimination. In East Chicago, 25 out of the city's 31 precincts (81%) are at risk of consolidation or elimination.

**Answer:** The allegations are denied.

74.    On February 23, 2017, State Senator Eddie Melton, who is African-American, proposed an amendment to SB 220 that would have defined a "small" precinct as one with fewer than 500 "active" voters instead of 600 "active" voters—bringing the LCPCL in line with the 2014 Lake County Precinct Consolidation Law. That amendment failed on a party line vote of 40 to 9.

**Answer:** The defendants admit Senator Melton proposed an amendment, and that proposed amendment speaks for itself. The defendants are without sufficient information to admit or deny the other allegations.

75.    SB 220 was passed in the Senate by a virtual party line vote of 38-11. It was passed in the House, also on a near party line vote, by a margin of 59-30. Not a single Democratic or African-American legislator voted in favor of the bill. Only four Republican legislators voted against it. Republican Governor Holcomb signed SB 220 into law on May 2, 2017.

**Answer:** The defendants admit that SB 220 passed the Senate 38-11, the House 59-30, and was signed into law on May 2nd. The defendants cannot admit or deny the other allegations because they are vague.

76.    SB 220 was enacted over vocal protests about the impact the Law will have on minority voters in particular, including those of the Lake County Board and Representatives Vernon Smith and Charlie Brown, both of whom are African-American Representatives from Gary and members of the Indiana Black Legislative Caucus.

27

**Answer:** The defendants are without sufficient information to admit or deny the allegations, but any suggestion that SB 220 is unlawful is denied.

77.    In March 2017, the Lake County Council adopted a resolution in opposition to SB 220. The resolution made clear that the Lake County Council opposed SB 220 for five principal reasons: (1) SB 220 placed the decision-making of the consolidation of precincts solely in the hands of two individuals (the director and deputy director of the Lake County Board) by creating the Small Precinct Committee; (2) the legislation would result in state officials making decisions that should remain in the hands of Lake County; (3) SB 220 "would result in the disparate treatment of the voting rights of Lake County citizens when compared to citizens throughout the rest of the State of Indiana" because the legislation applied only to Lake County even though 27 counties in Indiana had a higher percentage of "small" precincts than Lake County; (4) SB 220 "would result in the disparate treatment between urban and rural citizens in Lake County, as well as between the citizens of Lake County and [the] rest of the State of Indiana;" and (5) the legislation "would decrease voter turnout by making it more onerous on voters to exercise their right to vote which is a major concern threatening the cornerstone of our democratic process."

**Answer:** The resolution would speak for itself, but any suggestion that SB 220 is unlawful is denied.

78.    Representative Brown stated that SB 220 "would . . . disproportionately affect areas of Lake County with higher minority populations," and that it was wrong for the legislation to target only Lake County.

**Answer:** The defendants are without sufficient information to admit or deny the allegation that Representative Brown made the quoted statement, but deny that the legislation wrongly "targeted" Lake County.

79.    Lake County Democratic Party Chairman, Jim Wieser, characterized the bill as voter suppression.

**Answer:** Notwithstanding Mr. Wieser's characterization, the defendants deny that SB 220 is voter suppression.

80.    The Indiana Black Legislative Caucus identified the measure at the outset of the session as one of its two major pieces of legislation of concern.

**Answer:** The defendants are without sufficient information to admit or deny the allegation, but deny any suggestion that SB 220 is unlawful.

81.    The former chairman of the Lake County Democratic Party similarly protested that the bill would hit northern Lake County's population "very hard," and that "people who live where they can't use public transportation, don't have a vehicle or are disabled may not be able to get to a consolidated precinct."

**Answer:** The defendants are without sufficient information to admit or deny what an unnamed former chairman said.

82.    Unless it is enjoined, the LCPCL will burden and potentially disenfranchise voters by requiring the forced consolidation of a substantial number of Lake County's voting precincts, including precincts disproportionately located in northern Lake County, which is home to a large segment of Indiana's minority population.

**Answer:** The defendants deny the allegations.

**C.    The Text of the Lake County Precinct Consolidation Law**

83.    Under the LCPCL, a "small precinct committee" was established in Lake County effective May 1, 2017 (the "Small Precinct Committee").

**Answer:** SB 220 speaks for itself.

84.    The Law requires the Small Precinct Committee to be comprised of the director and deputy director of the Lake County Board—Democrat Michelle Fajman and Republican Patrick Gabrione. The LCPCL gives the Board the authority to appoint members to the Small Precinct Committee by unanimous vote of the entire membership of the Board. If an additional member is appointed, then that additional member must be an employee of the Board, and a second additional member must also be appointed who is

both an employee of the Board and a member of a major political party in Lake County other than the political party of the first additional member. Thus, as designed, the Small Precinct Committee will always be evenly divided between Republicans and Democrats.

**Answer:** SB 220 speaks for itself.

85.    The Lake County Board is a statutorily created body ordinarily responsible for overseeing and administering all aspects of the election and registration process in Lake County. *See* Ind. Code § 3-6-5.2-6. It has express statutory duties and powers regarding the establishment of precincts in the county, and, if not for the LCPCL, the Board would have the power and authority to consolidate precincts on its own according to its own criteria, as it has done in the past. *See, e.g.*, Ind. Code §§ 3-6-5.2-6, 3-11-1.5-2.

**Answer:** The cited statutes speak for themselves.

86.    The Lake County Board, which is currently controlled by Democrats, consists of five members, including the circuit court clerk and two members of each major political party, appointed by their county party chairs. Ind. Code § 3-6-5.2-4. The circuit court clerk is elected by voters in Lake County. *See* Ind. Const., art. 6 § 2.

**Answer:** The cited statutes speak for themselves, but the defendants admit that the Lake County Board is currently majority-Democratic.

87.    The current clerk of the Lake County Circuit/Superior Court is Michael A. Brown, who is the first African American to serve in that position. The other four members of the Lake County Board are Democrats Kevin C. Smith and Dennis Hawrot, and Republicans Michael Mellon and Dana Dumezich. The Lake County Board's administrative office is led by Democratic Director Michelle Fajman and Republican Deputy Director Patrick Gabrione. Director Fajman and Deputy Director Gabrione are not voting members of the Lake County Board.

**Answer:** The defendants admit Michael A. Brown is the current clerk (but are without sufficient information to admit or deny assertions about the racial makeup of Lake County clerks), Michelle Fajman is the Democratic Director and Patrick

Gabrione is the Republican Assistance Director, and that they hold non-voting positions.

88.    By requiring an even partisanship balance on the Small Precinct Committee, the Law gives the Republican member or members of the Committee veto power over any plan to eliminate precincts, effectively removing from the Democratically controlled Lake County Board the statutory duties and powers it has regarding the number and placement of precincts in the county. *See, e.g.*, Ind. Code §§ 3-6-5.2-6, 3-11-1.5-2.

**Answer:** The defendants deny the allegations.

89.    In so doing, the LCPCL negates the voting rights of Lake County's electorate, which exercised those rights to elect a Democrat, Michael Brown, to be the Clerk of the Lake County Circuit/Superior Court and also the tiebreaking vote on the Lake County Board, which would otherwise be equally split between Republicans and Democrats. Thus, not only does the Small Precinct Committee strip power away from the Democratically controlled Board, it also strips power away from Lake County voters, who exercised their voting power by electing Clerk Brown.

**Answer:** The defendants deny the allegations.

90.    Under the LCPCL, the Small Precinct Committee is required to determine: (1) "[w]hich precincts within the county had fewer than [600] 'active' voters . . . as of November 1, 2016," (2) "[w]hether compliance with the precinct boundary standards set forth in IC 3-11-1.5-4 or IC 3-11-1.5-5 would prevent the combination of [any such] precinct," and (3) "[t]he potential savings in the administration of elections resulting from the combination of precincts under this section." Ind. Code § 3-6-5.2-10.

**Answer:** The cited statute speaks for itself.

91.    The subsections cross-referenced in the LCPCL as quoted above refer to separate provisions of Indiana law that place restrictions on how precincts may be drawn. Specifically, precincts may not cross the boundaries of the state, a county, a township, a district of the U.S. House of Representatives, or an Indiana senate or house legislative

district. *See* Ind. Code § 3-11-1.5-4. Further, the boundaries of a precinct must follow either "a boundary described in" Indiana Code § 3-11-1.5-4, a boundary of a city or town, a boundary of a town legislative body district, a boundary of a census block, or a boundary of a school corporation that does not follow a census block line. *Id.* § 3-11-1.5-5.

**Answer:** The cited statutes speak for themselves.

92.    The LCPCL provides that the Small Precinct Committee is required to determine whether compliance with the precinct boundary standards set forth in state law "would prevent the combination" of any precinct that has fewer than 600 "active" voters.

**Answer:** The cite statute speaks for itself.

93.    Upon information and belief, of the approximately 294 precincts at risk of consolidation, at least approximately 150 precincts could be consolidated without violating precinct boundary requirements under state law. A disproportionate number of these precincts are located in northern Lake County, which includes the majority-minority cities of Gary, East Chicago, and Hammond.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

94.    The LCPCL does not give the Small Precinct Committee the discretion *not* to consolidate or eliminate a precinct that has fewer than 600 "active" voters if doing so would not violate the state law restrictions on the types of precincts that can be consolidated. Under the Law, the Small Precinct Committee does not have the ability to take local issues into account in completing the required analysis or drafting a proposed precinct consolidation plan. For example, issues such as the accessibility of public transportation in certain areas, the history of each precinct and the local customs and divisions that have led to the location of particular precincts, and the ability of voters in particular areas to travel to vote, are rendered irrelevant by SB 220.

**Answer:** The defendants deny the allegations, although it is difficult to figure out exactly what the plaintiffs are alleging given the number of negatives in the paragraph.

95.     Under the LCPCL, an "active voter" is anyone "who is not an inactive voter under IC 3-7-38.2" as of November 1, 2016. Ind. Code §§ 3-6-5.2-10, 3-11-18.1-2. A voter is designated "inactive" under Ind. Code § 3-7-38.2 as a result of the County's voter list maintenance process. The "inactive" designation indicates that the County has reason to believe that a voter may have moved.  However, voters who are designated as "inactive" are still eligible to vote, and many voters designated as inactive have not in fact moved, and do show up to vote.[3]

**Answer:** The cited statutes speak for themselves.

96.     After the Small Precinct Committee has completed its initial analysis, it is required to "establish a proposed plan to consolidate precincts within the county that is consistent with the standards [in the Law]." *Id.* § 3-6-5.2-10(d).

**Answer:** The cited statute speaks for itself.

97.     Although the LCPCL does not provide a date by which the Committee must establish its proposed plan, it contemplates virtually immediate action, because it requires the Lake County Board to adopt the Committee's proposed plan "[n]ot later than noon June 1, 2017" (less than 30 days after SB 220 became law), and "file the proposed order [adopting the plan] with [Indiana's] election division no later than noon August 1, 2017." *Id.* § 3-6-5.2-10(e).

**Answer:** The cited statute speaks for itself.

---

[3] The County may determine, based upon returned mail, the United States Postal Service Change of Address service, or some other reliable second-hand information, that the address listed in the voter's registration record may no longer be the voter's current residence address. *See* Ind. Code §§ 3-7-38.2-5, 3-7-38.2-6. The County will then send a notice to the voter asking the voter to verify her current address. *See id.* § 3-7-38.2-13. The County will designate the voter as "inactive" if the notice is returned as undeliverable and the voter does not vote in the next election, or if the voter fails to return the card within 30 days. *See id.* § 3-7-38.2-2. Inactive voters may be removed entirely from the voter rolls if they do not appear to vote for two general elections after being designated as inactive. *See id.* § 3-7-38.2-14. These safeguards help to ensure that eligible voters are not removed from the voter rolls because second-hand information erroneously indicated that the voter had moved.

98.    If the Lake County Board fails to file such an order as directed by the August 1 deadline, then the task of consolidating precincts in Lake County falls to the state. In that situation, the Law requires the four-member State Commission to "adopt a precinct establishment order for the county no later than September 1, 2017, based on the committee's proposed plan," or—"[i]f the commission does not have the committee's plan and findings available,"—"an order [that] the commission considers will . . . [r]ealize savings for the county . . . [and n]ot impose unreasonable obstacles on the ability of the voters of the county to vote at the polls." *Id*. § 3-6-5.2-10(f). "Unreasonable obstacles" is not defined by the LCPCL or the Indiana Code.

**Answer:** The cited statute speaks for itself.

99.    If the proposed precinct establishment order is approved by the State Commission, the order will be effective as of January 1, 2018, just months before the U.S. Senate election in which U.S. Senator Joe Donnelly is up for re-election.

**Answer:** The deadlines set forth in the statute speak for themselves.

100.    If an objection to the proposed order is filed under Ind. Code § 3-11-1.5-18—which requires objections be filed no later than noon ten days after the publication of notice of the proposed precinct establishment order by the county executive—then the proposed order will still take effect on January 1, 2018, unless three members of the State Commission affirmatively vote to sustain the objection.

**Answer:** The cited statute speaks for itself.

101.    The authorization for the LCPCL expires on January 1, 2020.

**Answer:** The cited statute speaks for itself.

**D.    Application of the Lake County Precinct Consolidation Law**

102.    As noted, the timing of the enactment of the LCPCL and the deadlines contained within it gave the Small Precinct Committee less than one month to convene, propose, and agree upon a consolidation plan.

**Answer:** The cited statute speaks for itself.

34

103.    On May 12, 2017, a Small Precinct Committee was convened that consisted of the two members identified by the Law—Ms. Fajman, the Democratic Director of the Board, and Mr. Gabrione, the Republican Deputy Director of the Board. Constrained by the 600 "active" voter threshold, Director Fajman proposed a plan that identified approximately 109 precincts that would be consolidated or eliminated. By contrast, Deputy Director Gabrione proposed a plan that identified approximately 154 precincts that would be consolidated or eliminated.

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

104.    Given the short time frame and expansive scope of the task, the Small Precinct Committee was unable to agree on a proposed consolidation plan to present to the Board by the June 1, 2017 deadline.

**Answer:** The defendants deny the argumentative allegations, but admit the Committee did not propose a consolidation plan by June 1, 2017.

105.    Accordingly, the Lake County Board was not able to file a proposed precinct consolidation plan by the LCPCL's August 1 deadline, and thus, the task falls to the State Commission to adopt a precinct establishment order for the county no later than September 1, 2017.

**Answer:** The statute speaks for itself, and the defendants are without sufficient information to admit or deny the other allegations.

106.    Thus, as was predictable given the parameters of the process set forth by the Law, the task of consolidating Lake County's precincts—a task which every other county in Indiana has the exclusive authority to undertake in light of each county's unique needs and characteristics—will now be assumed by a state agency, which necessarily lacks the specific local knowledge or experience to reasonably determine which precincts may be consolidated and/or eliminated without burdening the rights of Lake County voters.

**Answer:** The defendants deny the allegations.

35

107.    On June 23, 2017, the State Commission adopted procedures and deadlines for the submission and consideration of proposed plans for the consolidation of "small precincts" in Lake County pursuant to the LCPCL.

**Answer:** The defendants admit the State Commission adopted procedures and deadlines on June 23, 2017.

108.    Those procedures provided that noon on July 13, 2017 was the deadline for a member of the Lake County Board, director or deputy director of the Lake County Board, or Lake County Democratic, Republican, or Libertarian party chairs to submit a proposed precinct consolidation plan to the Indiana Election Division. The deadline for submission of a plan by the Lake County Board is noon on August 1, 2017.

**Answer**: The defendants deny the underlying suggestion that the Commission adopted a deadline that precluded plan submission after the dates noted in the allegations. In addition, while the complaint was filed on August 9, 2017, the allegations speak of a future deadline of August 1, 2017, making this allegation vague and ambiguous, so the allegations are denied.

109.    The procedures further provided that proposed plans will be posted on the Indiana Election Division website, along with a notice concerning the opportunity for public comment, which may be submitted in written form or in person at the State Commission's August 9, 2017 meeting. Although at least two plans were submitted by July 10, they were not accessible on the Commission's website until Friday, July 28, 2017, making it impossible for the Lake County Board to evaluate those plans prior to the August 1 deadline imposed on it by the Commission, or for any meaningful public review and comment by the Commission's scheduled August 9 meeting. As of August 7, 2017, no notice regarding concerning opportunity for public comment has been posted to the Indiana Election Division website. The Indiana Election Commission Public Session Notice dated August 3, 2017 does not indicate whether or when public comment will be allowed during the August 9, 2017 meeting. The meeting is scheduled to take place in the Indiana State

36

House in Indianapolis, which is over two hours away from Lake County by automobile. On information and belief, although hearing rooms in the Indiana State House have the capability to broadcast live audio and/or video over the internet, the Indiana Election Commission does not plan to broadcast its August 9, 2017 meeting live.

> **Answer:** The procedures and public notice speak for themselves, and the defendants deny the other, argumentative allegations.

110.    On July 13, 2017, the Lake County Democratic Central Committee submitted a letter to the State Commission objecting to the Law, and any precinct consolidation plans that fail to take into account "disenfranchisement as a result of lack of public transportation," "the arbitrary nature of 600 'active voters' as a benchmark for consolidation," and the fact that the law only impacts Lake County, among other factors.

> **Answer:** The letter speaks for itself, but the defendants deny that SB 220 is unlawful.

111.    If the Indiana State Election Commission ultimately approves a mandatory precinct consolidation plan as contemplated by the Law, then the compelled consolidation of precincts must be completed by January 1, 2018, just months before the U.S. Senate election in which Senator Joe Donnelly is up for re-election. When Senator Donnelly was first elected in 2012, he defeated his Republican opponent Richard Mourdock narrowly— by approximately 140,000 votes. Notably, African Americans provided the margin of victory to Senator Donnelly, representing 15.6% of his total vote. Senator Donnelly picked up an 85,000 vote plurality in Lake County, which was particularly key to his victory.

> **Answer:** The defendants admit that Donnelly defeated Mourdock by over 140,000 votes. The defendants deny the other allegations because they are vague or speculative.

### III.    The Lake County Precinct Consolidation Law Impermissibly Burdens, Abridges, and Denies the Right to Vote

#### A.    Burdens Imposed by SB 220

112.    The elimination of precincts in Lake County will directly burden the right to vote. The burdens imposed by the LCPCL will be especially severe for African-American and Hispanic voters, particularly those in northern Lake County, where the majority of precincts will be eliminated.

**Answer:** The defendants deny the allegations.

113.    Voting is a habit and a custom, and recent research has demonstrated that changes in polling locations associated with precinct consolidations have a substantial effect on turnout because of the accompanying increased costs of voting.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations because the source of the research is not cited. Any suggestion that SB 220 burdens voters is denied.

114.    The costs of voting are *already* substantially higher for low-income voters who are more likely to rent and who frequently move from one residence to another, requiring updates to their registration to maintain their ability to vote.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations because they are vague. Any suggestion that SB 220 burdens voters is denied.

115.    Due to the continuing effects of historical discrimination suffered by Indiana's minority population, low-income voters in Lake County are more likely to be African-American or Hispanic than White, and they are also more likely to be elderly, disabled, and/or support Democratic candidates.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations because they are vague. Any suggestion that SB 220 burdens voters is denied.

116.    Changes in the voting process and the resulting burdens associated with those changes only *further* increase the costs of voting, and these increases in costs have a disproportionate impact on minorities, the working poor, the elderly, disabled voters, and voters who tend to vote Democratic.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations. Any suggestion that SB 220 burdens voters is denied.

117.    These increased costs include not only the cost of traveling to a voter's polling place, but also the "search costs" associated with obtaining information about the new polling place and locating it.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations. Any suggestion that SB 220 burdens voters is denied.

118.    For some voters whose precincts are eliminated as a result of the LCPCL, the costs associated with traveling further to vote at a polling place in their newly assigned precinct will impose severe burdens. For a subset of those voters, it will result in their total disenfranchisement.

**Answer:** The defendants deny the allegations.

119.    Given that Lake County lacks a meaningful, reliable public transportation system, voters who live in poverty and do not have access to a car—in many cases as a direct result of Indiana's history of discrimination—will suffer particularly severe burdens in attempting to exercise their right to vote if their precinct is eliminated and their polling place is changed. Low-income voters who typically have little flexibility in their work day and must vote during a narrow window before or after work will similarly suffer severe burdens.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations. Any suggestion that SB 220 burdens voters is denied.

120.    The LCPCL will also significantly increase the costs of voting for all Lake County voters who reside in areas where precincts are consolidated or eliminated, because

the elimination of precincts is virtually certain to result in longer wait times to vote at polling places in the consolidated precincts.

**Answer:** The defendants deny the allegations.

121.    Counties in Indiana that have high numbers of voters per precinct, such as Marion County, have suffered from hours-long lines in recent elections, especially during presidential election years. By forcing Lake County to substantially increase the number of voters per precinct, the LCPCL significantly increases the likelihood that voters will encounter long lines at the polls, which will make it significantly more burdensome for voters, especially low-income and minority voters, to vote.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations about the voting situation in Marion County because the allegations are vague. The defendants deny the other allegations.

122.    As with the other burdens discussed above, research has consistently shown that the burdens associated with longer wait times to vote have a substantially more significant impact on low-income and minority voters. In this case, where the vast majority of the precincts at risk are in fact located in low-income and largely minority neighborhoods, those impacts will only be exacerbated.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations about uncited research has shown. The premise of the other speculative allegations, that SB 220 burdens voters, is denied.

123.    Voters in northern Lake County, including the large population of minority voters, will be further disproportionately burdened by the LCPCL because they traditionally vote at polling places in their precincts on Election Day and do not vote via absentee ballot. This is the result of several factors largely unique in Indiana to the minority communities that populate Lake County. In these communities, where the right to vote only followed the fierce and diligent fight of several generations, there is a profound significance that remains to this day in casting a vote in person at the polls on Election

Day. And because these communities have repeatedly suffered—even after they were legally granted the right to vote—from both official and non-official acts meant to make it harder for them to exercise that right, they often have a profound and general mistrust of forms of voting other than in-person voting.

> **Answer:** The paragraph is argumentative, and the defendants deny the allegations, specifically the suggestion that SB 220 burdens voters.

124.    Changes in polling place locations as a result of consolidating precincts are also associated with higher rates of out-of-precinct voting.

> **Answer:** The defendants are without sufficient information to admit or deny the allegations.

125.    Studies of the effects of precinct consolidation in other states have shown that the rate of out-of-precinct voting is 40% higher for voters who experience a change in polling place; turnout was lower among those voters whose polling locations changed; and out-of-precinct voting is far more common among minorities than among non-Hispanic Whites.

> **Answer:** The defendants are without sufficient information to admit or deny allegations based on uncited "studies." Any suggestion that SB 220 is unlawful is denied.

126.    Given that minority voters are already more likely to vote out of precinct, and African Americans and Hispanics are more likely to experience a polling place change under the LCPCL because the majority of precincts that will be eliminated are in northern Lake County where most of the county's minority population resides, Lake County's minority population is more likely to be forced to cast votes out of precinct as a result of the changes made by the Law. And given that the Law does not allocate any funds for voter outreach or education, the problem of out-of-precinct voting among Lake County voters is likely to be further exacerbated.

> **Answer:** The defendants deny the allegations.

127.    That the LCPCL will drive up the number of voters who cast ballots out of precinct is highly significant, because Indiana generally rejects all ballots cast by a voter in a precinct other than the one to which he or she is assigned. Thus, in this way, too, the LCPCL will impose the ultimate burden on Indiana voters: total disenfranchisement.

**Answer:** The defendants deny the allegations.

128.    In sum, the LCPCL interacts with the ongoing effects of Indiana's and Lake County's history of discrimination against African Americans and Hispanics to disproportionately abridge, deny, and burden the right to vote of African Americans and Hispanics in Lake County.

**Answer:** The defendants deny the allegations.

**B.    Reduction in Number of Precinct Committeepersons**

129.    Precinct committeepersons are directly elected to four-year terms by voters in Lake County. Precinct committeepersons represent the most fundamental, virtually grassroots level of government, and thus embody the principle of direct, representative democracy upon which our nation was founded. By virtue of their positions, precinct committeepersons are directly in contact with and accountable to the voters that elected them. Indeed, precinct committeepersons are often the elected officers that voters consult when they have questions about the voting process.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations because they are vague and ambiguous. The defendants deny any suggestion that SB 220 is unlawful.

130.    Precinct committeepersons also have the important role of filling vacancies in legislative and local offices. When voting to fill vacancies, each committeeperson is given one vote. *See Buncich*, 51 N.E.3d at 149-50 (Rucker, J., dissenting) (citing Ind. Code §§ 3-13-1-5, 3-13-1-6, 3-13-5-1, 3-13-11-3).

**Answer:** The cited dissent from *Buncich* and statutes speak for themselves.

131.    Reducing the total number of precinct committeepersons representing minority communities in northern Lake County will directly reduce the influence of minority voters in filling vacancies.

**Answer:** The defendants cannot admit or deny the allegations because they are vague, ambiguous, and speculative.

132.    Because the majority of precincts that are at risk of consolidation are located in northern Lake County in the predominantly African-American and Hispanic cities of Gary, East Chicago, and Hammond, the LCPCL will disproportionately minimize the influence of African-American and Hispanic voters in the county.

**Answer:** The defendants deny the allegations.

133.    For example, the LCPCL will disproportionately reduce the number of precinct committeepersons in the heavily-minority second and third city council districts in Hammond, which will dilute the voting power of voters in those districts when there is a vacancy in an at-large city council seat. The Hammond City Council is comprised of six members who are elected by the voters in their districts and three members who are elected at-large. If one of the at-large members resigns, then the precinct committeepersons in all of the city council districts in Hammond would each be entitled to cast one vote to fill the vacancy.

**Answer:** The defendants deny the allegations because they are all speculative.

134.    Because the LCPCL will have the effect of disproportionately reducing the number of precinct committeepersons in the heavily-minority city council districts in Hammond, the influence of the precinct committeepersons who represent minority communities will be minimized relative to the votes of the precinct committeepersons who represent majority-White communities.

**Answer:** The defendants deny the allegations.

### C.    The Lake County Precinct Consolidation Law SB 220 Does Not Further State Interests

#### 1.    The Law Targets Lake County Without a Rational Basis

135.    The General Assembly justified the LCPCL as a cost-saving measure to reduce the costs of election administration. However, Lake County is far from the only county in Indiana with a significant number of precincts that would be considered "small" under the Law's current definition. Yet, no legislation has been proposed to consolidate "small precincts" in any county except for Lake County. Further, proponents of the bill did not substantiate their claims that it would in fact result in the substantial net savings for Lake County that they claimed.

> **Answer:** The defendants deny the allegations because they are argumentative, vague, and ambiguous.

136.    There are approximately 24 counties in Indiana other than Lake County in which at least half of the county's precincts have fewer than 600 "active" voters. They include Martin, Ohio, Union, Benton, Clinton, Pike, Vermillion, Posey, Crawford, Warren, Newton, Fayette, Switzerland, Spencer, Perry, Cass, Daviess, Rush, Parke, Fountain, Pulaski, Whitley, Jasper, and Orange Counties.

> **Answer:** The defendants deny the underlying supposition that the situation in Lake County is comparable to that in the listed counties.

137.    With the exception of Lake County, none of the aforementioned counties has a significant minority population. Only two of these counties—Perry and Vermillion—have a majority of locally elected officials who are Democrats.

> **Answer:** The defendants deny the underlying supposition that the situation in Lake County is comparable to that in the listed counties.

138.    Of these 24 counties, Martin and Ohio Counties have the largest percentage of precincts with fewer than 600 "active" voters, as approximately 94% and 91% of their precincts would be considered "small" under the Law, respectively.

**Answer:** The defendants deny the underlying supposition that the situation in Lake County is comparable to that in the listed counties.

139.   The General Assembly cannot assert a rational basis to explain why it has now twice passed legislation to target Lake County's small precincts without addressing the high numbers of small precincts in any of Indiana's other counties. If the purpose of the LCPCL is actually to reduce the costs of election administration, then it is inexplicable why the Law is not aimed at all counties in Indiana that have small precincts.

**Answer:** The defendants deny the allegations.

140.   The General Assembly has attempted to justify singling out Lake County in SB 220 by distorting data about Lake County's small precincts.

**Answer:** The defendants deny the allegations.

141.   As an example, the General Assembly has compared the number of registered voters per precinct in other counties (a number that includes both "active" and "inactive" voters") to the number of "active" voters per precinct in Lake County. This results in a skewed comparison that makes it appear as if a significantly lower number of voters vote at Lake County's precincts than at precincts in other counties.

**Answer:** The defendants deny the allegations.

142.   The most egregious example of this was Senator Niemeyer's comparison of Lake County to Marion County, in which he suggested that Marion County has approximately 1,200 "active" voters per precinct as compared to 600 "active" voters per precinct in Lake County. Testimony of Senator Niemeyer, Indiana House of Representatives Elections and Apportionment Committee Meeting at 3 (Mar. 15, 2017). This is false; Marion County has 1,200 registered voters per precinct, and only approximately 900 "active" voters per precinct.

**Answer:** The defendants deny the allegations.

## 2.    The Purported Rationales for the Lake County Precinct Consolidation Law Are Arbitrary and Tenuous

143.    The LCPCL burdens, abridges, and denies the right to vote of African-American and Hispanic voters who are significantly more likely than Whites in Indiana to vote Democratic. The LCPCL imposes maximum burden and disparate impact in that regard.

**Answer:** The defendants deny the allegations.

144.    Unsurprisingly, the General Assembly has been opaque about the impact the Law will have and it has explained its reasons for passing the LCPCL on grounds that are arbitrary and/or tenuous.

**Answer:** The defendants deny the allegations.

145.    First, the General Assembly has asserted that Lake County would save $100,000 per election by consolidating precincts under the LCPCL. But as discussed, the General Assembly has not addressed the fact that other counties in Indiana could also save significant amounts of money by consolidating their small precincts, nor has it substantiated claims that the Law will in fact result in the substantial net savings for Lake County that purportedly justified the Law.

**Answer:** The defendants deny the allegations.

146.    The General Assembly has not put forth any evidence to support its claims that the Law will result in significant cost savings for Lake County, much less its unsubstantiated contention that the Law will result in substantial savings per election to the county, or to establish that the costs of voter education efforts associated with the Law would not offset that savings. In reality, the Law may have the opposite effect, resulting in an increase in the cost of elections in Lake County, because the county may need to hire more election workers or purchase additional voting machines to accommodate the higher numbers of voters at each precinct and the accompanying long lines at the polls.

**Answer:** The defendants cannot admit or deny the allegations because it is unclear what the plaintiffs mean by "put forth any evidence." The defendants deny the additional allegations.

147.    Second, the General Assembly has not provided any legitimate justification or basis to explain why the definition of "small precinct" under the LCPCL includes any precinct that has fewer than 600 "active" voters instead of 500 "active" voters (as was the case in the 2014 Law) or some other number.

**Answer:** The defendants deny the allegations.

148.    The Director of the Lake County Board, Michelle Fajman, emphasized this point in a January 2017 letter to the Chairman of the House Elections and Apportionment Committee when she stated, "The barometer of six hundred (600) 'active' voters, as used in the statute, is as arbitrary and unsupported by statistics as was the five hundred (500) voter figure used in the initial legislation."

**Answer:** The defendants are without sufficient information to admit or deny the allegations.

149.    The General Assembly cannot explain the sudden tightening of the threshold from 500 to 600 "active" voters, especially where the Lake County Board volunteered to consolidate precincts using the 500 "active" voter threshold. The only logical explanation is an impermissible one: that the General Assembly, emboldened by the Indiana Supreme Court's reversal on the state constitutional claims, seized the opportunity to further burden the voting rights of even more of northern Lake County's predominantly minority voters. But neither the Indiana Supreme Court's ruling, the Voting Rights Act, nor the federal Constitution permits such a result.

**Answer:** Paragraph 149 is a legal conclusion; thus, a response is not required. If the paragraph makes factual allegations, the defendants deny them.

150.    Finally, the state cannot explain why it requires precincts to be consolidated based on the number of "active" voters in the precinct as of November 1, 2016, instead of

47

using a more recent cutoff date or real time data. The November 1, 2016 cutoff date is over six months before the LCPCL was enacted and almost two years before the effective date of the Law.

**Answer:** The defendants deny the allegations.

151.    Using the arbitrary cutoff date of November 1, 2016 will have the effect of eliminating more precincts, including some precincts that currently have 600 or more "active" voters or which may have such number of voters by the next significant election, but had fewer than 600 "active" voters as of November 1, 2016.

**Answer:** The defendants deny the allegations.

152.    Defining "small" precincts to include precincts that had fewer than 600 "active" voters as of November 1, 2016 is not just the wrong metric in theory; it will have the effect of increasing the number of voters who are burdened by the LCPCL in practice.

**Answer:** The defendants deny the allegations.

153.    For example, voters have registered to vote and updated their address for registration purposes since November 1, 2016. Many who applied to register to vote in the November 2016 election but submitted their applications after the October 11, 2016 deadline have now been added to the rolls, but may not have been added as of November 1, 2016. These voters are all considered "active" because they are on Indiana's voter registration rolls. However, because these voters were not registered to vote as of November 1, 2016, they will not be counted for purposes of determining whether a precinct has fewer than 600 "active" voters.

**Answer:** The defendants deny the allegations.

154.    Accordingly, several precincts that are considered "small" under the LCPCL because they had fewer than 600 "active" voters as of November 1, 2016 now have more than 600 "active" registered voters, and should not be at risk of consolidation, even pursuant to the Law's irrational standards.

**Answer:** The defendants deny the allegations.

IV.    **History of Discrimination Against Racial and Ethnic Minorities in Indiana and Lake County**

155.    The LCPCL represents a continuation of Indiana's and Lake County's long history of discrimination against racial minorities, particularly in voting.

**Answer:** The defendants deny the allegations.

156.    The first African Americans to live in Indiana were slaves of French settlers who were brought to the state as early as 1746.

**Answer:** The defendants are without sufficient information to admit or deny with historical certainty the irrelevant assertions. The underlying supposition that SB 220 is discriminatory is denied.

157.    In 1787, the U.S. Congress organized Indiana under the Northwest Ordinance which prohibited slavery, providing that "there shall be neither slavery nor involuntary servitude" in Indiana. Pro-slavery advocates circumvented that rule, however, by adopting a measure entitled "An Act concerning the Introduction of Negroes and Mulattoes into this Territory," which permitted any person owning or purchasing slaves outside of Indiana to bring their slaves with them to Indiana and bind them to service. As a result, even after the Northwest Ordinance was passed, nearly all of the African-American population in Indiana was held captive under a system of indentured servitude that differed little from outright slavery.

**Answer:** The defendants are without sufficient information to admit or deny with historical certainty the irrelevant assertions. The underlying supposition that SB 220 is discriminatory is denied.

158.    After slavery and indentured servitude were ended, largely as a result of the 1820 Indiana Supreme Court case *State v. Lasselle*, 1 Blackf. 60 (Ind. 1820), which ordered all slaves, except those held before the 1787 Northwest Territory Ordinance, to be freed, overt discrimination against African Americans continued. Emma Lou Thornbrough, a leading historian of the history of African Americans in Indiana, has written that the White population in Indiana "manifested racial attitudes usually thought to be

characteristic only of a certain class of Southern Whites. That the colored population was inherently inferior was a doctrine which the majority accepted without question, and in line with this belief racial barriers, both legal and social, were tightly drawn."

>Answer: The defendants are without sufficient information to admit or deny with historical certainty the irrelevant assertions. The case and statement by Ms. Thornbrough speak for themselves. The underlying supposition that SB 220 is discriminatory is denied.

159.   As an example, following the adoption of the Indiana Constitution in 1816, African Americans seeking to settle in Indiana were required to register with county authorities and to post a $500 bond as a guarantee of good behavior.

>**Answer:** The defendants are without sufficient information to admit or deny with historical certainty the irrelevant, vague, and ambiguous assertions. The underlying supposition that SB 220 is discriminatory is denied.

160.   Then, in 1851, the Indiana Constitution was amended to completely prohibit African Americans from settling in Indiana.

>**Answer:** The 1851 Indiana Constitution speak for itself. The underlying supposition that SB 220 is discriminatory is denied.

161.   Throughout the nineteenth century, Indiana state laws further barred African Americans from voting, serving in the militia, and from testifying in court cases in which a White person was a party. African-American children were not allowed to attend public schools. There was even a movement, partially funded by the state, to rid the state of African Americans forever—by convincing them to move to Liberia.

>**Answer:** The statutes that are merely gestured at speak for themselves. The other allegations are denied because they are vague and ambiguous. The underlying supposition that SB 220 is discriminatory is denied.

162.   Long after the Fifteenth Amendment to the U.S. Constitution was ratified in 1870, African Americans still did not have full access to the franchise in Indiana. African

Americans were frequently violently intimidated at the polls by White paramilitary groups, including a notorious group in Indiana called "The Wide Awakes," which was responsible for physically assaulting and attacking voters at the polls during the 1876 elections in Indianapolis.

> **Answer:** The defendants are without sufficient information to admit or deny with certainty the irrelevant, vague, and ambiguous assertions. The underlying supposition that SB 220 is discriminatory is denied.

163.    Indeed, Indiana has a particularly gruesome history of racially motivated violence against African Americans. In a well-known example, referred to as the "lynching of Thomas Shipp and Abram Smith," on August 7, 1930, three African-American teenagers were famously accused of murdering a young White man and raping his girlfriend. While the teenagers were being held in jail, a mob broke into the jail, dragged the teenagers out, and lynched two of them. The third suspect narrowly escaped the lynch mob. No one was ever charged for their murders.

> **Answer:** The defendants are without sufficient information to admit or deny with certainty the irrelevant, vague, and ambiguous assertions. The underlying supposition that SB 220 is discriminatory is denied.

164.    Indiana is also known for having had the largest and most politically significant state organization in the national Ku Klux Klan movement of the 1920s. More than 25% of native-born adult White men in Indiana became members. At its peak in 1924, the Klan counted the governor of the state, Edward L. Jackson, among its members.

> **Answer:** The defendants are without sufficient information to admit or deny with certain the irrelevant allegations. The underlying supposition that SB 220 is discriminatory is denied.

165.    In 1946, the Gary, Indiana School Board adopted its own unprecedented policy prohibiting racial discrimination, providing that children shall not be discriminated

against "in the school district in which they live, or within the schools they attend, because of race, color, or religion."

> **Answer:** The defendants are without sufficient information to admit or deny with certain the irrelevant allegations. The underlying supposition that SB 220 is discriminatory is denied.

166. Nevertheless, segregation in schools persisted in Gary, and Indiana generally, long after that policy was adopted and well after the 1954 landmark *Brown v. Board of Education* decision.

> **Answer:** The defendants are without sufficient information to admit or deny with certain the irrelevant allegations. The underlying supposition that SB 220 is discriminatory is denied.

167. Indeed, almost a decade later, 100 African-American schoolchildren in Gary brought a lawsuit against the Gary schools, claiming that the city's schools were still systematically segregated. *See Bell v. Sch. City of Gary, Ind.*, 213 F. Supp. 819 (N.D. Ind. 1963), *aff'd*, 324 F.2d 209 (7th Cir. 1963). Specifically, the children alleged that city schools in Gary were maintained as racially segregated in violation of their constitutional rights and that they had been discriminated against because their schools suffered from inferior instruction and curriculums and overcrowded conditions as compared to the White schools. Although the court acknowledged that Gary's high schools were segregated, and that predominantly African-American schools were overcrowded and had less experienced teachers, the court found no violation of the students' constitutional rights because it concluded that the problem of school segregation in Gary stemmed from segregated housing.

> **Answer:** The cited case speaks for itself. The underlying supposition that SB 220 is discriminatory is denied.

168. School segregation in Indiana continued after *Bell*. In the 1970s, African-American students and their parents sued the Evansville-Vanderburgh School District to

enjoin the district from operating its schools in a racially discriminatory manner. *Martin v. Evansville-Vanderburgh Sch. Corp. of Evansville.*, 347 F. Supp. 816, 816 (S.D. Ind. 1972). The plaintiffs alleged that the school's desegregation plan "did not go far enough to eliminate the vestiges of racial segregation, as required by the Fourteenth Amendment," in part because under the plan, "over half of the schools would remain all white," and African-American students would be concentrated in several underperforming schools. *Id.* at 817, 819. The district court enjoined the school district from implementing this plan, finding that it plainly did not satisfy the district's obligations under the Fourteenth Amendment to desegregate its schools. *Id.* at 820.

> **Answer:** The cited case speaks for itself. The underlying supposition that SB 220 is discriminatory is denied.

169.    One year later, in *United States v. Board of School Commissioners of Indianapolis*, 368 F. Supp. 1191, 1202-03 (S.D. Ind. 1973), *aff'd in part rev'd in part*, 503 F.2d 68 (7th Cir. 1974), a federal district court held that the State of Indiana had engaged in de jure segregation of the public schools in Indianapolis, Indiana.

> **Answer:** The cited case speaks for itself. The underlying supposition that SB 220 is discriminatory is denied.

170.    More recently, in the late 1980s, students and parents in Fort Wayne, Indiana sued Fort Wayne Community Schools (and a number of individuals) "alleging that the public elementary schools of Fort Wayne are racially segregated." *Parents for Quality Educ. with Integration v. Indiana*, 977 F.2d 1207, 1208 (7th Cir. 1992). The school district ultimately settled with the plaintiffs, agreeing to implement a more aggressive desegregation policy.

> **Answer:** The cited case speaks for itself. The underlying supposition that SB 220 is discriminatory is denied.

171.    Most recently, on May 2, 2017, Common Cause Indiana and the Indiana State Conference of the NAACP brought suit against the Marion County Elections Board for

statutory and constitutional violations based on Marion County's lack of access to early voting. The lawsuit alleges that Marion County—which has only one early voting site for its more than 900,000 residents—has discriminated against African-American voters in failing to provide for additional early voting sites, because African Americans in Marion County are more likely to vote early than Whites.

> **Answer:** The complaint filed in the unrelated case speaks for itself. The underlying supposition that SB 220 is discriminatory is denied.

172.    Prior to the November 2008 election, the Lake County Board voted, along party lines, to add early voting sites in the majority-minority cities of Gary, East Chicago, and Hammond. Soon thereafter—out of concern that additional early voting locations would lead to higher minority voter turnout, and in a flagrant attempt to make it more burdensome for minority voters in Lake County to vote—the Republican members of the Lake County Board brought a lawsuit to enjoin all voting at the early voting sites in Gary, East Chicago, and Hammond. They argued that early voting sites in these three cities should not have been opened because there was no unanimous vote by the Lake County Board approving the locations. The Lake County Board argued that a unanimous vote was unnecessary because the three locations—one in each city—were in government offices (in the circuit court clerk's offices) and not at "satellite" voting sites. The case was ultimately resolved in favor of the Lake County Board, when on October 31, 2008, the Court of Appeals in Indiana affirmed the decision of the Lake County Superior Court. *See Curley v. Lake Cty. Bd. of Elections and Registration*, 896 N.E.2d 24 (Ind. Ct. App. 2008). The Court of Appeals held that it was reasonable for the trial court to conclude that the office of the circuit court clerk is not equivalent to a temporary satellite voting site, and thus unanimous approval to open the locations was unnecessary. The Court of Appeals also held that, "the public interest in exercising the right to vote unquestionably weighs heavily on the side of the Board's decision to open these early voting locations, especially when the . . . Plaintiffs have wholly failed to show that they have been harmed in any way." *Id.* at 40.

While the lawsuit was ultimately unsuccessful, it serves as a prime example of the ways in which Indiana Republicans have engaged in a targeted effort to make voting more difficult for minority voters in northern Lake County.

> **Answer:** The cited case speaks for itself. The defendants deny that it is demonstrates anything about SB 220.

173.    Both Indiana and Lake County have a history of racially polarized voting. Richard Hatcher, who was elected in 1967 as the first African-American mayor of Gary, faced overwhelming White opposition to his candidacy. Indeed, Hatcher received only approximately 15% of the White vote. Hatcher was only elected because he won approximately 95% of the African-American vote and African-American voters turned out in record numbers to support his candidacy.

> **Answer:** The defendants are without sufficient information to admit or deny with certain the irrelevant allegations. The underlying supposition that SB 220 is discriminatory is denied.

174.    Voting in Indiana continues to be racially polarized. Marion and Lake Counties are both home to large minority populations and reliably vote Democratic. In 2016, both counties voted for Hillary Clinton, Democratic Senate candidate Evan Bayh, and Democratic gubernatorial candidate John Gregg by wide margins. By contrast, Hamilton and Allen Counties, both of which have populations which are over 80% White, reliably vote Republican. In 2016, both counties voted for Donald Trump, Republican Senate candidate Todd Young, and Republican gubernatorial candidate Eric Holcomb by large margins.

> **Answer:** The defendants deny the allegations because they are irrelevant, vague, and ambiguous.

175.    Voting within Lake County is also racially polarized. In the 2016 presidential election, for example, East Chicago, which is a majority-minority city in Lake County, voted overwhelmingly for Hillary Clinton. Meanwhile, in Lowell, an area of Lake County

that is 91% White, Hillary Clinton received only about 30% of the vote, with the remainder going to President Trump and Gary Johnson.

> **Answer:** The defendants deny the allegations because they are irrelevant, vague, and ambiguous.

176.    Indiana has elected very few African Americans to major offices. The first African American to be elected to statewide office was Pamela Carter, who became Secretary of State in 1992. Indiana has never elected an African American as governor or to the United States Senate. Only two African Americans have ever served on the Indiana Supreme Court. Justice Rucker, the most recent African-American justice to serve on the Indiana Supreme Court (and only the second African American to ever serve on the court), retired in May 2017.

> **Answer:** The defendants admit that two African Americans have served on the Indiana Supreme Court. The defendants deny that Pamela Carter served as Secretary of State—she was Indiana's Attorney General. The defendants deny the other allegations. The underlying supposition that SB 220 is discriminatory is denied.

177.    Indiana has never elected a Hispanic governor, attorney general, or member of Congress, nor has it ever had a Hispanic supreme court justice. Hispanics make up close to 7% of the state's population and 18% of the population in Lake County, yet there is only one Hispanic member in the Indiana House of Representatives and none in the Indiana Senate.

> **Answer:** The defendants are without sufficient information to admit or deny the allegations. The underlying supposition that SB 220 is discriminatory is denied.

## V.    The Ongoing Effects of Indiana's and Lake County's History of Discrimination

178.    African Americans and Hispanics in Indiana and Lake County have suffered from, and continue to suffer from, the effects of official discrimination in a number of areas,

including education, health, housing, employment, income, transportation, and criminal justice.

**Answer:** The defendants cannot admit or deny the allegations because they are vague and ambiguous. The underlying supposition that SB 220 represents official discrimination is denied.

179.    As of December 2016, Lake County had the highest unemployment rate in the state, at 5.9%. This is largely due to the high unemployment rates in the county's three largest cities, and the only three cities in the county with significant minority populations, each of which has substantially higher unemployment rates. Specifically, as of 2016, the unemployment rate in Gary, which was 84.8% African American as of the 2010 Census, was 8.4%. In East Chicago, which was 42.9% African American and 50.9% Hispanic as of the 2010 Census, the unemployment rate was 8.1%. By contrast, during the same period, the state of Indiana's unemployment rate was 4.0%, and Schererville, a majority-White city in Lake County, had an unemployment rate of 4.3%.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations.

180.    According to the Indiana Business Research Center at Indiana University's Kelley School of Business, as of the 2010 U.S. Census, Whites were almost twice as likely as African Americans to own a home in Indiana.

**Answer:** The defendants do not have sufficient information to admit or deny the allegations.

181.    Gary, Indiana—which is located in northern Lake County and is likely to be hardest hit by the LCPCL—is extremely residentially segregated. According to one analysis of 2000 census data, the city had the highest "dissimilarity index" of all metro areas in the United States at 87.9, on a scale that ranges in value from 0, which means completely integrated, to 100, which means completely segregated.

**Answer:** The defendants admit the city of Gary is in Lake County, deny that it will be "hit" by SB 220, and are without sufficient information to admit or deny the other allegations.

182.   Infant mortality rates for African Americans in Indiana far exceed those for Whites. The Indiana State Department of Health observed in 2011 that African-American infants are 1.8 more times likely to die than White infants.

**Answer:** The allegation suggesting that SB 220 has anything to do with infant mortality is inflammatory and is consequently denied.

183.   In addition to being discriminated against in the political and educational spheres, African Americans in Indiana, particularly in company towns like Gary, have been persistent victims of environmental racism. After U.S. Steel's Gary Works was founded in Gary in 1906, Gary became known as one of the most polluted cities in the country. While the White, wealthier Gary residents could afford to escape the pollution in downtown Gary by moving to the suburbs, they left behind poor people and racial minorities to bear disproportionate residential exposures to industrial pollution in the city. In June 2016, the mayor of East Chicago, a majority-minority city, ordered the relocation of residents of a housing complex that had been built on the site of a defunct lead smelter which caused extremely high levels of lead contamination in the soil and drinking water in the area.

**Answer:** The allegations have nothing to do with SB 220, are vague and ambiguous, and are consequently denied.

184.   The effects of environmental racism continue in Indiana, especially in Lake County, and Indiana's elected officials have not been responsive to the particularized needs of minorities. Former Governor Mike Pence did little to nothing to help residents of the housing complex in East Chicago even though city officials had apparently known about the problem for decades. And, that same year, former Governor Pence responded immediately to aid a community in Greentown, Indiana when its drinking water tested

high in lead. Greentown is 97% White. By contrast, East Chicago is 42.9% African American and 50.9% Hispanic.

**Answer:** The allegations have nothing to do with SB 220, are vague and ambiguous, and are consequently denied.

185.    In 2009, the Indiana Department of Transportation determined that the Cline Avenue bridge—which was an important route for Lake County residents to travel to Chicago—was unsafe. In 2013, the state demolished it. Since then, the state has failed to rebuild the bridge, and the 35,000 cars and trucks per day that previously traveled on the bridge must now travel along local streets in East Chicago, Hammond, and Gary. After years of failing to put forth a plan to reconstruct the bridge, the state has now outsourced the reconstruction of the bridge to a private company that will replace the bridge—which was previously free to traverse—with a toll bridge. Hammond Mayor Thomas McDermott Jr. recently raised the issue of the Cline Avenue bridge at a Northwestern Indiana Regional Planning Commission meeting, noting that the situation is a "travesty" that is "beating up [his] city." According to McDermott and East Chicago Mayor Anthony Copeland, the state has not directed any money to fix the local roads that are being stressed in the bridge's absence.

**Answer:** The allegations have nothing to do with SB 220, are vague and ambiguous, and are consequently denied.

186.    According to the 2011-2015 American Community Survey 5 Year Estimates, in 2015, approximately 31.9% of African Americans and 29.3% of Hispanics in Indiana live below the poverty level, as compared to 12.7% of Whites.

**Answer:** The defendants are without sufficient information to admit or deny the allegations. The underlying supposition that SB 220 is discriminatory is denied.

187.    Many residents of northern Lake County live in poverty and do not have reliable access to a vehicle. Public transportation is not easily accessible in Lake County.

In fact, there is no county-wide transportation available, and the public transportation options that exist within some municipalities in Lake County are woefully inadequate.

**Answer:** The defendants are without sufficient information to admit or deny the allegations. The underlying supposition that SB 220 is discriminatory is denied.

188.    African-American and Hispanic students graduate from high school at significantly lower rates than their White peers. In the 2011-2012 school year, for example, the high school graduation rate for African-American students was 73% as compared to an 86% statewide average. Hispanic students graduated at a rate of 80%. White students, by contrast, had an 89% graduation rate.

**Answer:** The defendants are without sufficient information to admit or deny the allegations. The underlying supposition that SB 220 is discriminatory is denied.

189.    Political campaigns in Indiana have involved both explicit and implicit racial appeals. In the month before the November 2016 election, Kokomo, Indiana voters were intimidated and threatened by vandals who spray-painted residential front doors and gates, a car, and a trailer in the city with racist messages and threats, most of which referenced the Ku Klux Klan. The only residences targeted were those that displayed Democratic campaign signs and properties in close proximity to Democratic signs or other materials.

**Answer:** The defendants are without sufficient information to admit or deny the allegations. The underlying supposition that SB 220 is discriminatory is denied.

190.    Prior to the 2016 presidential election, an Independence Day parade in central Indiana featured a display of President Obama sitting on a toilet above the words "Lying African."

**Answer:** The defendants are without sufficient information to admit or deny the allegations. The suggestion that an offensive sign in some unnamed town has anything to do with SB 220 is inflammatory. The underlying supposition that SB 220 is discriminatory is denied.

191.    The continued effects of discrimination on African Americans and Hispanics in Indiana generally, and Lake County in particular, continues to hinder minorities' ability to participate effectively in the political process. The LCPCL will only worsen those effects.

**Answer:** The defendants deny the allegations.

## CAUSES OF ACTION

## COUNT I

## (Violation of the Equal Protection Clause of the Fourteenth Amendment - Disparate Treatment of Voters)

192.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

**Answer:** The defendants restate and incorporate their answers to the earlier paragraphs.

193.    All laws that distinguish between groups must at least be rationally related to a legitimate state interest to survive scrutiny under the Equal Protection Clause. *See Nordlinger v. Hahn*, 505 U.S. 1, 11 (1992). Where fundamental rights and liberties are at issue, classifications which might invade or restrain them must be closely scrutinized and carefully confined. *Harper v. Virginia State Bd. of Elections*, 383 U.S. 663, 670 (1966).

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

194.    Voters who reside in Lake County's "small precincts" are similarly situated to voters who reside in "small precincts" in other counties in Indiana.

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

195.    Yet, as described, the LCPCL only requires the consolidation of precincts with fewer than 600 "active" voters in Lake County. It does not apply to any of the approximately 1,345 "small precincts" in Indiana's other 91 counties despite the fact that

61

the Law has been primarily defended as a cost-saving measure, and there are 24 counties in the state (not including Lake County) in which at least half of the precincts have fewer than 600 "active" voters.

> **Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

196.    The LCPCL imposes significant burdens on the right to vote for voters in Lake County. The burdens imposed by the LCPCL are especially severe for certain populations, including African Americans, Hispanics, poor voters, and disabled voters. These burdens are not imposed upon similarly situated voters in other Indiana counties.

> **Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

197.    There is no rational basis, let alone compelling state interest, for requiring Lake County to consolidate its "small precincts" and impose the associated significant burdens on the right to vote upon Lake County voters while not treating other counties in Indiana the same, particularly those counties that have a significant number and percentage of small precincts.

> **Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

198.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Equal Protection Clause.

> **Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

199.    Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth Amendment by implementing and enforcing the LCPCL.

> **Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

## COUNT II
## (Violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment - Undue Burden on the Right to Vote - *Anderson-Burdick*)

200.    Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

**Answer:** The defendants restate and incorporate their answers to the earlier paragraphs.

201.    Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a court considering a challenge to a state election law must first carefully balance the character and magnitude of the injury to First and Fourteenth Amendment rights that the plaintiff seeks to vindicate against the justifications put forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983). "It then must identify and evaluate the *precise interests* put forward by the State as justifications for the burden imposed by its rule." *Anderson*, 460 U.S. at 789 (emphasis added). The court "must not only determine the legitimacy and strength of each of those interests; it also must consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.*

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

202.    "However slight th[e] burden may appear, . . . it must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (citation and internal quotation marks omitted). And, "it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status." *Anderson*, 460 U.S. at 793.

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

203.   The LCPCL imposes significant, unjustified burdens on the right to vote for voters in Lake County. The burdens imposed by the LCPCL are especially severe for certain populations, including African Americans, Hispanics, poor voters, and disabled voters. The burdens of the Law far outweigh any of the Law's purported, unsubstantiated benefits. For these reasons alone, the Law should be invalidated.

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

204.   By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

205.   Unless enjoined by order of this Court, Defendants will continue to violate the First and Fourteenth Amendments by implementing and enforcing the LCPCL.

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

## COUNT III
### (Violation of Section 2 of the Voting Rights Act)

206.   Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

**Answer:** The defendants restate and incorporate their answers to the earlier paragraphs.

207.   Section 2 of the Voting Rights Act, 52 U.S.C. § 10301, prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

64

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

208.   A violation of Section 2 of the Voting Rights Act occurs when (1) a voting standard, practice, or procedure was enacted or maintained, at least in part, by an invidious purpose; or (2) the evidence establishes that, in the context of the "totality of the circumstance of the local electoral process," the standard, practice, or procedure has the result of denying a racial minority an equal opportunity to participate in the political process.

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

209.   Against a backdrop of high African-American and Hispanic turnout in Lake County during the 2012 U.S. Senate election in which Democratic Senator Donnelly was elected by a narrow margin, the Indiana General Assembly enacted the LCPCL, which will take effect just 10 months before Senator Donnelly runs for re-election in November 2018.

**Answer:** The defendants deny the allegation as stated because it is built on a logical fallacy that sequence means consequence.

210.   In considering the LCPCL, the General Assembly rejected at least one amendment that could have reduced the burden that the Law will have on minority voters in Lake County.

**Answer:** The defendants admit that at least one amendment was proposed, but deny the allegation that SB 220 is a "burden."

211.   Upon information and belief, the General Assembly enacted the LCPCL with knowledge of Indiana's history of voting discrimination, the resulting continuing socioeconomic impacts borne by its African-American and Hispanic citizens, and the disproportionate impact that the Law would have on minority citizens' ability to vote.

**Answer:** The defendants deny the allegations.

212.    The LCPCL was passed while local officials in Lake County were left in the dark, working under the threat of the passage of HB 1147, to execute a plan to consolidate precincts while carefully accounting for unique local circumstances, including the history of each precinct, the local customs and divisions that have led to the location of particular precincts, and the ability of voters in particular areas to travel to vote.

**Answer:** The defendants deny the allegations.

213.    Due to social and economic conditions caused by historical and ongoing discrimination, including poverty, high rates of unemployment, lower educational attainment, and lack of access to transportation, minority voters will be disproportionately burdened by the LCPCL.

**Answer:** The allegations are legal conclusions to which no response is required. Any allegation that SB 220 is unlawful is denied.

214.    The law targets Lake County only, home to Indiana's largest Hispanic population and second largest African-American population.

**Answer:** The allegation is argumentative and is denied.

215.    Moreover, African-American and Hispanic voters disproportionately vote in their precincts on Election Day as compared to White voters, and the LCPCL's reduction of precincts in Lake County will interact with social and economic conditions caused by historical and ongoing discrimination in Lake County and Indiana generally, to result in an adverse discriminatory impact on African-American and Hispanic voters.

**Answer:** The defendants deny the allegation that SB 220 is unlawful or otherwise discriminatory.

216.    The LCPCL will also have the effect of reducing the number of precinct committeepersons in the county. Reducing the number of these officials will directly minimize the influence of the voters in northern Lake County, and particularly in Gary, East Chicago, and Hammond, which have significant minority populations, by reducing

the total number of votes that precinct committeepersons from such neighborhoods will cast in favor of filling vacancies for candidates and elected offices.

**Answer:** The defendants deny the allegations.

217.   By enacting the LCPCL, the Indiana legislature intended, at least in part, to deny or abridge the voting rights of minority voters in Lake County.

**Answer:** The defendants deny the allegations.

218.   Viewed in the totality of the circumstances, Indiana's implementation and enforcement of the LCPCL will interact with economic, historical, and ongoing social conditions in Indiana and Lake County to result in the denial or abridgement of equal opportunities for minority voters to participate in the political process, in violation of Section 2 of the Voting Rights Act.

**Answer:** The defendants deny the allegations.

219.   By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by Section 2 of the Voting Rights Act.

**Answer:** The defendants deny the allegations.

220.   Unless enjoined by order of this Court, Defendants will continue to violate Section 2 of the Voting Rights Act by implementing and enforcing the LCPCL.

**Answer:** The defendants deny the allegations.

<u>**COUNT IV**</u>
<u>**(Violation of the Fourteenth and Fifteenth Amendments - Intentional Discrimination)**</u>

221.   Plaintiffs re-allege and incorporate by reference all prior paragraphs of this Complaint and the paragraphs in the counts below as though fully set forth herein.

**Answer:** The defendants restate and incorporate their answers to the earlier paragraphs.

222.    Legislation intended, at least in part, to discriminate on the basis of race in the voting context violates the Fourteenth and Fifteenth Amendments. *See*, *e.g.*, *City of Mobile v. Bolden*, 446 U.S. 55, 62, 66 (1980); *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-66 (1977).

**Answer:** The cite cases speak for themselves.

223.    In certain cases, statistical disparities "warrant and require" a "conclusion . . . irresistible, tantamount for all practical purposes to a mathematical demonstration," that a state acted with discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments. *See Gomillion v. Lightfoot*, 364 U.S. 339, 341 (1960); *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886).

**Answer:** The cited statutes speak for themselves. Any allegation is denied because it calls for a legal conclusion.

224.    Over 60% of Indiana's African-American population resides in just two counties—Marion and Lake. Lake County is home to Indiana's second largest African-American population and its largest Hispanic population.

**Answer:** The defendants deny the allegations because this is in the "violation" section and because they are vague and ambiguous.

225.    On information and belief, by targeting Lake County—one of the very few counties in Indiana with a significant minority population—with mandatory, forced precinct consolidation, which will have the effect of severely burdening the voting rights of minority voters in Lake County, the Indiana legislature intended, at least in part, to suppress the votes of African-American and Hispanic voters in Indiana.

**Answer:** The defendants deny the allegations.

226.    The LCPCL singles out Lake County for forced precinct consolidation despite the fact that numerous other majority-White counties in Indiana have similar or higher percentages of "small" precincts than Lake County, as well as large numbers of "small" precincts overall. Indeed, because the Law only targets Lake County, *none* of the majority-

White counties in Indiana that have significant numbers or percentages of "small" precincts will be affected.

**Answer:** The defendants deny the allegations.

227.   Within Lake County, the Law will have a disproportionate impact on northern Lake County. The LCPCL has the potential to eliminate or consolidate a substantially disproportionate number of precincts in northern Lake County—specifically in Gary, East Chicago, and Hammond, Indiana—where the majority of the county's minority population resides.

**Answer:** The defendants deny the allegations.

228.   By engaging in the acts and omissions herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed to them by the Fourteenth and Fifteenth Amendments.

**Answer:** The defendants deny the allegations.

229.   Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth and Fifteenth Amendments by implementing and enforcing the LCPCL.

**Answer:** The defendants deny the allegations.

## COUNT V
## (Violation of the Fourteenth Amendment - Fencing)

230.   The U.S. Supreme Court has specifically held that it is a violation of the Equal Protection Clause to "fence out" from the franchise a sector of the population because of the way they vote. *Carrington v. Rash*, 380 U.S. 89, 94 (1965). Similarly, the First Amendment protects citizens against "a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth v. Jubelirer*, 541 U.S. 267, 314 (2004) (Kennedy, J., concurring).

**Answer:** The cited cases speak for themselves. The defendants deny any allegation that SB 220 is unlawful.

231.    Upon information and belief, the LCPCL was intended to suppress (that is, fence out) and, unless declared illegal and enjoined, will in fact suppress the voting rights of Lake County voters, who were targeted because of their racial composition and because of the way that they, as members of largely minority communities, are expected to vote—i.e., for Democratic candidates.

**Answer:** The defendants deny the allegations.

232.    By engaging in the acts and omissions alleged herein, Defendants have acted and continue to act to deny Plaintiffs rights guaranteed by the Equal Protection Clause of the Fourteenth Amendment.

**Answer:** The defendants deny the allegations.

233.    Unless enjoined by order of this Court, Defendants will continue to violate the Fourteenth Amendment by implementing and enforcing the LCPCL

**Answer:** The defendants deny the allegations.

## AFFIRMATIVE DEFENSES

1.    Plaintiffs fail to state a claim upon which relief may be granted.

2.    Plaintiffs' Complaint is not ripe or it is moot.

3.    Plaintiffs' Complaint against some defendants are barred by sovereign immunity.

4.    Plaintiffs' Complaint is barred by the Rooker-Feldman doctrine.

5.    Plaintiffs' Complaint is barred by the doctrine of res judicata.

6.    Plaintiffs cannot establish any discriminatory conduct occurred or will occur as a result of SB 220.

7.    Actions performed in accordance with SB 220 do not violate Plaintiffs' equal protection rights.

8.    Actions performed in accordance with SB 220 afforded Plaintiffs equal protection as to others similarly situated.

9.    The Voting Rights Act of 1965, as amended, is inapplicable to the facts and circumstances alleged in the complaint.

10.    Plaintiffs have failed to show SB 220 places a disproportionate burden on minorities' or other voters in Lake County.

11.    Plaintiffs' allegations are insufficient to constitute a violation of the Voting Rights Act of 1965.

12.    SB 220 does not deny or abridge any voting right.

13.    The defendants reserve the right to assert any and all additional affirmative and other defenses that may become applicable based on information learned during discovery or for other appropriate reasons.

Respectfully Submitted,

CURTIS T. HILL, JR
Attorney General of Indiana

By:    *s/ Jefferson S. Garn*
       Jefferson S. Garn
       Senior Deputy Attorney General
       Atty. No.  29921-49

## CERTIFICATE OF SERVICE

I hereby certify that on October 3, 2017, a copy of the foregoing was filed electronically using the Court's CM/ECF system, sending notice to the following party who may access this filing using the Court's system:

Abha Khanna
Aria C. Branch
Bruce V. Spiva
Charles G. Curtis, Jr.
Mark E. Elias
Perkins Coie LLP-Was/DC
700 13th Street NW
Suite 600
Washington, DC 20005

Shana D. Levinson
Levinson & Levinson
384 W. 80th Place
Merrillville, IN 46410


 *s/ Jefferson S. Garn*
Jefferson S. Garn
Senior Deputy Attorney General


Office of the Attorney General
Indiana Government Center South
302 W. Washington St., 5th Floor
Indianapolis, IN   46204
Phone: (317) 234-7119
FAX:   (317) 232-7979
Email:  Jefferson.Garn@atg.in.gov